UNITED STATES, Appellee

v.

MARVIN W. SIMS, Sergeant, U. S. Army, Appellant

5 USCMA 115, 17 CMR 115

No. 4808

Decided November 5, 1954

LT COL Harley A. Lanning, U. S. Army, LT COL James C. Hamilton, U. S. Army, MAJ Edwin Doran, U. S. Army, 1ST LT Richard B. Dempsey, U. S. Army, 1ST LT Albert T. Ussery, U S. Army, 1ST LT Justin L. Vigdor, U. S. Army, and 1ST LT Robert C. Taylor, U. S. Army, for Appellant.

LT COL Thomas J. Newton, U. S. Army, LT COL William R. Ward, U. S. Army, MAJ Merle C. Rideout, Jr., U. S. Army, and 1ST LT Paul D. Heyman, U. S. Army, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

After affirmance of his conviction for larceny, in violation of Article 121, Uniform Code of Military Justice, 50 USC § 715, the accused petitioned this Court for further review. We granted his petition to consider the following issues:

"(1) Whether the law officer erred in instructing the court that it appeared no issue of wrongful appropriation had arisen.

"(2) Whether the accused was prejudiced by the references of trial counsel in argument to the silence of the accused during the investigation of the theft and recovery of the money."

On Sunday afternoon, November 1, 1953, Private First Class Flood placed his wallet in the back pocket of his trousers. These he placed on a hanger in his wall locker and locked the locker. The wallet contained $100.00 in military payment certificates and United States currency. The accused and two other persons were present in the room. Flood then left to engage in a basketball game. Several hours later, he returned. He went to his locker and discovered that the top hinge had been pulled loose. Opening the locker, he found his trousers askew, the pocket open, and his wallet missing. Immediately, he reported the loss to the battalion duty officer, Lt. Ratliff. He also informed him of the denominations of the bills, as follows: six military payment certificates, each in the face amount of $10.00, two $10.00 greenbacks, one $5.00 bill, two $2.00 bills, and eleven $1.00 bills.

Lt. Ratliff telephoned Captain Schull, the commanding officer of the unit of which Flood and the accused were members, and told him of the theft. Captain Schull ordered Lt. Ratliff to communicate with the Criminal Investigation Division and "to do whatever was necessary to recover the money." In a few hours, a Criminal Investigation Division agent arrived. Following some discussion with Flood, they decided to talk to the accused. Accompanied by Flood, they proceeded to the accused's room. Finding him there, they informed him of Flood's loss, and asked him if they could search his belongings. He readily agreed. The search uncovered six $10.00 military payment certificates in his shirt pocket; and in the inside pocket of the "Ike" jacket, which had been locked in his locker, were found greenbacks in the exact amount, number, and denomination as those taken from Flood's wallet. The accused was placed under arrest.

At the trial, the accused took the stand. He acknowledged the search and the discovery of the money. However, he denied stealing it. He said that as he was on his way to talk to a fellow soldier (who apparently shared the same barracks with Flood), he saw money lying on the floor. This was in the hallway "right in front of the door." He picked it up. Then he opened the door to the room and looked in. Seeing no one, he "decided not to say anything about it," but, he "was going to turn the money in the next morning to the company commander so that he could determine who it belonged to." He did not go to the orderly room, but he knew that the commanding officer was not present, and since it was Sunday, other officers would not normally be present. He put the money "in . . . [his] pocket" and went to his own room to sleep. He was awakened by Lt. Ratliff, Flood, and the Criminal Investigation Division agent. He further testified as follows:

"A. . . . I asked what happened and they told me and asked if they could search my locker; I agreed with them because I had done nothing wrong. I handed them all the clothes they asked when they asked for them and they found the money. And then he told me, he read me Article 31 first, and then he told me that I was suspected of stealing the money. And I got kind of scared then. He asked me if I wanted to make a statement, I told him I didn't, I was scared. So —

Q. Did you subsequently make a statement?

A. Not until the pretrial, sir.

Q. And did you make a statement at that time?

A. Yes, sir, I did.

Q. Was it the same statement that you have made here today?

A. Yes, sir."

Asked why he did not report his find when informed by Lt. Ratliff that Flood had lost "certain amounts of money," his explanation was that, "they didn't say how much it was. If they had stated how much it was I would have told them." However, he admitted that the information roused his suspicions "that that might be the money." Pressed to explain the division of the money into two parts, he said, "I don't know why it was separated, sir. I just looked at it; when I looked at it I put some in this pocket and some in the other pocket. I had no reason at all for separating it."

Other testimony by the accused was to the effect that he had no financial difficulties, and that he had no "particular need" for money. He was Flood's friend, and he got along "very well" with him. Additionally, Captain Schull and another officer testified for the accused. They said that they never had occasion to doubt the accused's honesty or truthfulness and his "general reputation" in the unit was good.

In his closing argument, trial counsel described the accused's testimony as a "fantastic story." He commented on the contradiction between the accused's initial statement that he put the money in his pocket and its discovery in two separate places. He also referred to the accused's failure to inform any of the duty officers of his find. In the final part of his argument he said:

". . . The prosecution contends that his very actions negative the story that he has told on the stand. In the presence of Lieutenant Ratliff, Pfc Flood and the CID Agent, he was informed that certain money was missing. He made no statement concerning the money, he remained silent. After the money was found in his possession of the same denominations as that stolen he remained silent. Gentlemen, the prosecution contends that that's a tacit admission that he had taken that money illegally, because he was being accused at that time of larceny and he made no denial of it. He was not under arrest, restriction, or anything else at that time, but he remained silent. We submit, gentlemen, that he hadn't had time enough yet at that time to figure out a good story."

No objection was made by defense counsel to any of the trial counsel's remarks. In his own closing argument, the defense counsel maintained that:

". . . The accused has told you how he happened to come into possession of the money, what he intended to do with it. This clearly negatives any intent to deprive anyone of the money. And only he knows what this intent was. We submit that the evidence of the prosecution is not sufficient to show that he—to show by

circumstantial evidence that he had a different intent."

He then advanced several reasons why the court should believe the accused. One of these referred to the length of accused's service and his intelligence, and pointed out, "that any man with his intelligence and experience would know that a few dollars taken under such circumstances would not be worth the risk of his career."

In rebuttal, trial counsel adverted to the issue of intent and said:

"Now, as to the accused's intent: Certainly, we're not mind readers and we have to go by the circumstantial evidence. The law officer will charge you later that proof of intent can be shown by circumstantial evidence. And the prosecution contends that that intent is amply shown by the actions of this accused in dividing this money and remaining silent when the investigation was going on, and even after it was found. Now, we contend that if his intentions were honorable, when he first found that money, if that story were true, he would have taken it to the responsible military authorities. He has been in the Army long enough to know the proper way to do things and he failed to do it. We contend that his very actions indicated that he intended to keep that money for his own use."

Again no objection was made. Moreover, in reply to a specific inquiry from the law officer, the defense counsel said that he had nothing further to offer. Thereupon, the law officer proceeded to instruct the court on the applicable law.

After instructing on the elements of the offense charged, the law officer advised the court that wrongful appropriation is a lesser included offense of larceny. However, he said that it did not appear to him that the commission of that offense was raised by the evidence, and "Therefore, unless requested by the court, I will not instruct you as to the lesser included offense of wrongful appropriation." No exception was taken by defense counsel, and,

he expressly noted that he desired no "special instructions."

The first question is whether the law officer erred in instructing the court that wrongful apropriation ▓▓▓▓▓▓▓ ▇ was not in issue. Considering the Government's case alone, the law officer's ruling was plainly correct. Gilbert v. United States, 215 F 2d 334, (CA DC Cir). However, the accused contends that his own testimony presented the lesser offense as a reasonable alternative to that charged. He argues that, properly instructed, the court could have believed his story of finding the money, and yet determine that he exercised a "temporary illegal dominion over it," because he failed to turn it over to one of the duty officers. This argument is directly contrary to the accused's contentions at the trial.

Under certain conditions, a finder of lost property may properly be charged with larceny if he intends to deprive permanently the general or special owner of its use or possession. Manual for Courts-Martial, United States, 1951, paragraph 200a(7). Wharton, Criminal Law, 12 ed, § 1141, et seq. We may assume, as argued by the accused that the finder may be guilty of the lesser offense of wrongful appropriation if he merely intends to deprive the owner temporarily of the use or possession of his property. Neither intent, however, is indicated by the accused's testimony at the trial.

The accused concedes that he "categorically denied . . . stealing Flood's money." As we read his testimony, he was equally emphatic in denying the lesser intent to misappropriate. Thus, he maintained that he did not deliberately fail to tell the duty officers of his find; it just "didn't occur" to him. At no time did he assert control over the money for any purpose other than that of innocent safekeeping. According to him, his only intent was to turn over the money to his commanding officer so that he could determine to whom it belonged. He clearly sought to create the impression that had it not been Sunday, he would have immediately delivered it. Further emphasis of his claim of purity of purpose appears in his volunteered explanation of his failure to disclose his find to Lt. Ratliff at the time of the search. In short, the accused's testimony constitutes a complete disclaimer of any criminal intent.

As the issue was presented by the accused, acquittal was the only alternative to conviction for the offense charged. See United States v. Jackson, 4 USCMA 294, 15 CMR 294. Clearly, his own counsel so understood his testimony. In his closing argument, he highlighted for the court the choice of guilt or innocence. After referring to the accused's story, he said, "This clearly negatives any intent to deprive anyone of the money. And only he knows what this intent was. . . . the evidence . . . is not sufficient to show that he . . . had a different intent." We can find no basis for any conclusion other than that the evidence did not reasonably raise the offense of wrongful appropriation, as lesser included to the larceny charged. Consequently, the law officer correctly instructed the court that the lesser offense was not in issue. United States v. Jackson, supra; United States v. Smith, 2 USCMA 312, 8 CMR 112.

For his second claim of error, the accused argues that trial counsel's remarks on the accused's silence ▓▓▓▓▓▓ ▇ lence at the time of the search were improper and prejudicial. The Government calls attention to the accused's failure to object to any of these comments, and urges application of the principle of waiver. Ordinarily, a failure to object to improper comment by the prosecuting attorney would preclude raising the issue on appeal. Mitchell v. United States, 208 F 2d 854, (CA 8th Cir 1954), cert den 347 US 1012, 98 L ed 1135, 74 S Ct 863; Langford v. United States, 178 F 2d 48, (CA 9th Cir 1949), cert den 339 US 938, 94 L ed 1355, 70 S Ct 669. In a number of cases which were before us on mandatory review, we considered this claim of error, even though no objection had been made at the trial. United States v. Ransom, 4 USCMA 195, 15 CMR 195; United States v. Lee, 4 USCMA 571, 16 CMR 145. The nature of those cases made

it appropriate to give appellate consideration to the allegation. But, we are not disposed to entertain such claims indiscriminately, when no effort has been made to curb the allegedly improper conduct, and to obtain a ruling from the law officer designed to eradicate the possibility of harm resulting from trial counsel's improprieties. See United States v. O'Briski, 2 USCMA 361, 8 CMR 161. However, since the accused strenuously argues that "trial counsel's questionable success in eking out a conviction was attributable solely to his closing argument," we think the interests of justice will best be served if we consider the claim upon the merits.

It is familiar learning that under certain circumstances the accused's failure to deny an accusation that he had committed the offense may properly be regarded as an incriminating admission. Manual, supra, paragraph 140a, page 251. United States v. Armstrong, 4 USCMA 248, 252, 15 CMR 248. The Manual rule is:

"Mere silence on the part of an accused when questioned as to his supposed offense is not to be treated as a confession. However, if the accused is not in arrest or custody or under investigation, there are circumstances under which his failure to utter a denial of an accusation or observation that he had participated in an offense may be regarded as incriminating evidence which is admissible, as when a friend of the accused, in discussing the disappearance of a watch, says to the accused, 'I saw you steal that watch last night,' and the accused remains silent. In such a case it would be only reasonable to expect the accused, if he were innocent, to exclaim to his friend that he had not stolen the watch. Before such incriminating evidence can be considered against the accused, it must be corroborated by other evidence that the offense had probably been committed by someone."

The accused contends that the conditions precedent to consideration of an admission by silence are not present in this case. He maintains, first, that there is no imputation of wrongdoing in the conversation preceding the search, and, second, that conceding proper accusation, the accused was then "under investigation" and, consequently, was not bound to answer. Arguendo, we are willing to grant the accused at least the second of his contentions, but this concession does not require a finding of error in trial counsel's comments.

Close examination of the testimony of the two prosecution witnesses who testified to the search indicates no attempt to present evidence of an admission by silence. Private Flood said only that he accompanied Lt. Ratliff and the agent to the accused's room. There he witnessed the conduct of the search and the discovery of the money, which he later marked with his initials. Lt. Ratliff's testimony contains no mention of any action by the accused other than that he readily consented to their request to search, and that he unlocked his wall locker. However, in his own testimony, which we have set out in part, the accused clearly opened the door to critical comment on his failure to speak when informed of the loss of the money. Thus, he maintained that he consented to the search because he "had done nothing wrong." After the discovery of the money, he did not reveal his own find because he "was scared." And, in an apparent attempt to foreclose a claim of recent fabrication, he testified in his direct examination that he had made a prior statement which was consistent with his story at the trial. Moreover, although he conceded that he had "suspicions" that the money lost was the same as that found by him, he affirmatively explained his silence by attributing it to the fact that "they didn't say how much it was"; had they done so, he would have told them. Quite obviously, the accused sought to justify his silence, in positive terms, as part of his own case. Having done so, it was certainly not improper for trial counsel to make fair comment on the adverse inferences that could reasonably be drawn from the accused's testimony. Scrutiny of the trial counsel's remarks shows nothing which can be said to exceed the

120

bounds of fair comment on the evidence.

The facts in this case closely parallel those in Peckham v. United States, 210 F 2d 693, (CA DC Cir 1953). In the Peckham case a police officer testified that, after the defendant was arrested, he talked with him about the offense and the accused responded, "No answer," "No statement." On the stand, the defendant was cross-examined about his answer, in an effort to persuade the jury that had the accused been innocent he would have denied guilt at that time. On appeal it was contended that prejudice resulted from this cross-examination, and from the prosecuting attorney's closing remarks, in which he argued to the jury that the accused's refusal to speak indicated guilt. In rejecting these contentions, the Court of Appeals for the District of Columbia said (page 699):

". . . The contention now is that prejudice resulted in permitting defendant to be cross-examined as to why he would make no statement to the officer. If it is thought that he was insulated from cross-examination in this regard because of the Fifth Amendment's protection against self-incrimination the point is disposed of by Raffel v. United States, 271 US 494. . . . It was there held that when a defendant takes the stand in his own defense he may be cross-examined about his failure to testify on his previous trial for the same offense. This court has similarly ruled in Viereck v. United States, 78 U. S. App. D. C. 279, 139 F. 2d 847, certiorari denied, 321 U. S. 794. . . . Implicit in these decisions is the right to cross-examine a defendant about his failure to seek to exonerate himself when questioned on a previous occasion, for if such cross-examination does not invade the protection of the Fifth Amendment in the circumstances presented in the Raffel and Viereck cases it does not invade its protection here. And we know of no other basis for excluding the cross-examination, assuming, as we do, that the 'No statement' evidence was properly admitted; for even if the accused could validly refuse to make a statement nevertheless when he took the stand he could be asked why he refused.[7]

---

[7] It is not suggested that the cross-examination was beyond the scope of the direct. We add that from our examination of the record it seems clear such a point would not be valid.

"Our disposition of the 'No statement' problem disposes of the further contention that it was improper for the prosecuting attorney to argue to the jury that the refusal indicated guilt. During his cross-examination the accused sought to justify his refusal on constitutional grounds. The loss of protection on that score which resulted from his taking the stand carried with it the loss of protection from use of the incident in the prosecution's summation provided the discussion of the point was otherwise fair. . . ."

Consequently, we find no merit in the accused's second claim of error. The decision of the board of review is affirmed.

Judges LATIMER and BROSMAN concur.