UNITED STATES, Appellee

v.

WASHINGTON ALLEN, Private E–1, U. S. Army, Appellant

5 USCMA 626, 18 CMR 250

627

628

No. 5611
Decided April 15, 1955

LT COL Edward Duvall, U. S. Army, for Appellant.

LT COL Thomas J. Newton, U. S. Army, 1ST LT Elliott H. Eisman,. U. S. Army, and 1ST LT A. Kenneth Pye, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

Before a general court-martial sitting in Korea, the accused faced charges alleging sodomy, in violation of Article 125 of the Uniform Code of Military Justice, 50 USC § 719, and assault with intent to commit sodomy, in violation of Article 134, 50 USC § 728. Convicted of the former offense only, he was sentenced to receive a dishonorable discharge, and to total forfeitures and confinement at hard labor for five years. The convening authority approved the findings of guilt and the sentence—and affirmance by a board of review in the office of The Judge Advocate General, United States Army, followed. The accused's petition for review was granted to enable this Court to consider three issues. Unlike the usual case, these do not center on the trial, but rather on the manner in which the charges against the accused were initially investigated and referred for trial, and that in which the court was convened thereafter to hear the cause.

II

Although certain of the allied papers served to create a certain amount of confusion, it appears that a correct chronology of the relevant events may be established. Both the sodomy and the assault were allegedly committed on the evening of April 26, 1954. A charge specifying only the former crime was preferred against the accused on April 28, and on the following day was referred to a Captain Smith for investigation, pursuant to the provisions of Article 32 of the Code, 50 USC § 603. By April 30, this investigation had been completed, and the report thereof was transmitted to the Commanding General, IX Corps. From the headquarters of this officer—who exercised general court-martial jurisdiction over the accused's organization—the charges and allied papers were returned with a suggestion that consideration be given to the desirability of adding a further charge alleging an assault with intent to commit sodomy.. In addition, it was directed that, if this: latter charge was to be preferred, a formal reinvestigation should be conducted.

The additional charge was filed, and thereafter the papers were transmitted to Captain Smith. The directed reinvestigation was then held, and its report forwarded through channels. This document arrived at headquarters, IX Corps, and on May 5, 1954, the case was referred for trial by the present general court-martial. However, the written advice of the staff judge advocate, recommending trial by general court-martial under both charges, bears date of May 6, 1954. The trial began on May 13, 1954.

The orders appointing the court-martial named fourteen officers as members,. but—when the body convened—only seven were present. Before pleading, the accused moved to dismiss the charges by reason of an asserted defect in the Article 32 pretrial investigation —namely, the circumstance that it appeared to have begun before the preferment of charges. The explanation of this phenomenon—made clear by the allied papers—lay in the preparation of an entirely new charge sheet at the time the additional charge of assault was filed on May 3. Purportedly, therefore, both charges had been preferred initially on that date—although in point of fact, one had originally borne date of April 28. After conferring with counsel, the law officer denied this motion to dismiss—and the palpable correctness of this ruling has not been contested on this appeal.

After the law officer's ruling, the defense moved to dismiss both charges on the ground that the court had been convened improperly. Its evidence— submitted during an out-of-court hearing—indicates that a practice existed in the IX Corps by which the convening

authority appointed a court of unusually substantial proportions. However, it was said to be understood that not all members would be called to sit at the same time. Instead, the staff judge advocate—or his executive officer—would select customarily those who were to appear at the trial of a particular case. So far as can be told, this selection was directed solely toward distributing equitably the impact of court membership, and appears to have been accomplished without any sort of purpose to influence the result of any case. Certainly there was no showing of an improper object here. The defense motion to dismiss on this ground was also denied—and thereupon the accused entered his plea of not guilty.

During the trial Allen took the stand to deny the allegations laid against him and, following his testimony, he was cross-examined by trial counsel with respect to suspected omissions in his pretrial investigation story. Cf. United States v. Sims, 5 USCMA 115, 17 CMR 115. The accused maintained that he had included in the account he gave Captain Smith all of the details with respect to which he was challenged by trial counsel—although they had in fact been omitted from the statements subsequently signed by him and attached as exhibits to the report of investigation. Captain Smith—called as a witness—related that he did not recall with assurance whether the accused had brought to his attention the favorable items subsequently recited by the latter to the court-martial. However, the Captain conceded readily that certain circumstances narrated by the accused had been omitted from the written statements taken during the Article 32 investigation. Accordingly, and quite properly, the law officer ruled that these statements signed before the investigating officer could not be utilized—as trial counsel had intended—to impeach the accused. At no time during the court-martial hearing was there a defense assertion that the summary of the accused's testimony set out by Captain Smith in these documents constituted such a defect in the pretrial investigation as to form a ground for halting the hearing.

## III

Appellate defense counsel now claims that the admitted omission of minor details from the written statements taken from the accused by Captain Smith rendered the Article 32 investigation defective. Disagreement must be expressed. Although it is true that, under the Code, the record of a trial by general court-martial must be a verbatim one, there is no such requirement with respect to the testimony secured during the investigation commanded by Article 32. In fact, that Article expressly provides that the report of investigation shall "be accompanied by a statement of the *substance* of the testimony taken on both sides." (Emphasis supplied.) It is manifest that this phrasing authorizes an impartial condensation of the information obtained from witnesses during this stage of the proceedings.

Of course, differences of opinion may exist with respect to what, in a particular case, constitutes "the substance" of heard testimony. To be sure, Captain Smith candidly conceded that "I might have left out some pertinent facts due to my lack of experience in investigations." Yet it seems certain that it was not the Congressional intendment that the summaries of testimony taken during a proceeding held in conformity to Article 32 must of necessity reflect every clue which might possess meaning for a Sherlock Holmes. Indeed, even the most careful investigator cannot foresee with accuracy every minor circumstance which may leap into prominence during the course of a trial—as, for example, those which came to the fore in the case at hand.

Having examined the statements taken from the accused by Captain Smith, no sort of incompetence on his part can be detected, nor any purpose to omit material which could in some manner serve to benefit the accused. The several statements executed by Allen reflect clearly that at all times he denied the truth of the very serious charges laid against him. Under the circumstances of this case, the presen-

tation of further details of these denials could not—in any conceivable fashion—have aided him in obtaining the dismissal of either charge without trial; nor could they have affected the ultimate decision of the convening authority to refer both for trial by general court-martial.

The Article 32 investigation—among other served purposes—provides for the accused a form of discovery. As was said by Felix Larkin, Esquire, one of the Code's principal draftsmen, during the course of a discussion of the provisions of Article 32:

". . . it is partially in the nature of a discovery for the accused in that he is able to find out a good deal of the facts and circumstances which are alleged to have been committed which by and large is more than an accused in a civil case is entitled to." [Hearings before the House Committee on Armed Services, 81st Congress, 1st session, on H.R. 2498, page 997. See also page 669.]

It is obvious that the defense here would have discovered nothing novel through the inclusion of additional details in the *accused's* written pretrial statements.

An accused is entitled, during the course of the Article 32 investigation, to tender a statement in any form. Manual for Courts-Martial, United States, 1951, paragraph 34*b*, *d*. The report of the investigation held here states that Allen was specifically informed of this right. In fact, he executed two statements—one during the initial investigation, the other during the reinvestigation. It seems certain that if there had been further matters he desired to have brought to the attention of the convening authority, he would have been permitted by Captain Smith to offer yet another written statement. Obviously, the accused had nothing further of importance to say— for there is no suggestion of dissatisfaction on his part with the completeness of the two statements prepared by the investigating officer for his signature.

Although it be assumed that Captain Smith's pretrial investigation was de-

fective—as appellate defense counsel believes it to have been—the present conclusion in the matter would remain unaffected. To be sure, under the Articles of War there was a certain amount of authority—found in both military decisions and in opinions rendered by civilian courts in habeas corpus proceedings—for the position that a failure to hold a proper pretrial investigation operated to deprive a general court-martial of jurisdiction. However, the Supreme Court acted to settle this issue to the contrary by holding that such an error did not affect jurisdiction. Humphrey v. Smith, 336 US 695, 93 L ed 986, 69 S Ct 830. See also Hearings before the Senate Committee on Armed Services, 81st Congress, 1st session, on S. 857, and H. R. 4080, pages 170–1.

The pronouncement in Article 32(*d*) to the effect that a failure to follow prescribed procedures in the course of the pretrial investigation "shall not constitute jurisdictional error" was clearly intended to adopt the Supreme Court's interpretation for the new Code. Thus, the Committee Reports dealing with that provision state:

"Subdivision (d) is added to prevent this article from being construed as jurisdictional in a habeas corpus proceeding. Failure to conduct the investigation required by this article may be grounds for reversal by a reviewing authority under this code. It is the intention of the committee that pretrial investigations be mandatory on military authorities who have the obligation to hold them, but that a failure to conduct such an investigation or less than full compliance, which does not materially prejudice the substantial rights of an accused, shall not constitute jurisdictional error. To hold otherwise would subject all cases involving a plea of guilty to reversal on jurisdictional error for failure to conduct a pretrial investigation. Certainly, the committee does not intend to endorse any provisions which will bring added delays and unnecessary technicalities into the system of military justice. On the other hand, it should be noted that an offi-

cer who has the responsibility to order a pretrial investigation who intentionally fails to have such an investigation conducted, and such failure substantially prejudices the rights of the accused, would be guilty of an offense under article 98 of this code." [See, Senate Report, No. 486, 81st Congress, 1st session, pages 16–17; House Report, No. 491, 81st Congress, 1st session, page 20.]

In even greater detail Mr. Larkin explained:

". . . I think that is right, Mr. Elston. There has been a considerable amount of difficulty in construing the binding nature of the pretrial investigation as provided, and that has been provided in the Army I guess since 1920. The Federal courts on writs of habeas corpus have scrutinized it and some have held that the absence or the failure to hold a pretrial investigation may be such jurisdictional error as requires a reversal of the verdict after trial. The point we are trying to make clear is that the pretrial investigation is a valuable proceeding but that it should not be a jurisdictional requirement.

"It is a valuable proceeding for the defendant as well as for the Government. We desire that it be held all the time. But in the event that a pretrial investigation, less complete than is provided here, is held and thereafter at the trial full and complete evidence is presented which establishes beyond a reasonable doubt the guilt of the accused, there doesn't seem to be any reason when he has had his day in court and where it is clearly demonstrated that he is guilty, that despite that demonstration the case should be set aside if the lack of full compliance doesn't materially prejudice his substantial rights.

"In other words, this is an investigation for purposes of determining whether there is probable cause and it is an investigation to assist the accused. It is not the trial. His day in court is at the trial and if there is demonstrated at the trial that he is guilty beyond a reasonable doubt it seems that that verdict should stand and should not be disturbed unless the lack of a pretrial investigation or the fact that there has been less than full compliance has materially prejudiced his substantial rights.

"Now if it has, that is and should be a grounds for reversal of a verdict of guilty. But by this article, we are trying to cure the interpretation that you require full compliance with it even though the lack of full compliance doesn't prejudice his rights when in truth and fact on the trial there is a full amount of competent evidence which demonstrates beyond a reasonable doubt the guilt.

"That in our opinion was the construction and intention of Congress when they wrote it in and it seems to us clear from the legislative history. Strangely enough, one of the courts—I have forgotten which one of the circuit courts, that is the United States court of appeal—reading that legislative history, have come to just the opposite conclusion and have decided that the Congress intended it to be completely jurisdictional. It is analogous, I should say, to the indictment proceedings you find in a civil court.

"Let us assume that you had less than full compliance before the grand jury but they indict nevertheless. Then the accused comes to trial and is convicted after the presentation of adequate, full and competent evidence. Then you would say that the conviction should be set aside even though the evidence on the trial is clearly sufficient to support the verdict because the indictment itself wasn't supportable.

"There is that rule actually in New York State, or at least that construction has been placed. But it is an odd one and it is one that is not uniformly acceptable at all.

"By virtue of this provision here in other words, if there was less than full compliance and that fact did not prejudice the substantial

right of the accused and further there was ample evidence on the trial to sustain the verdict, then the lack of full compliance would not be such a jurisdictional defect as would result in setting aside the findings.

"But, nevertheless, an authority in the military who does not hold a full pretrial investigation would be guilty of an offense. What we are trying to do here is require that it always be held.

"Now if it isn't, the person responsible for holding it is guilty of an offense. But even though it isn't, if you prove on your trial thereafter a full case and the lack of full compliance hasn't materially prejudiced the substantial rights, then it does not become jurisdictional error.

"MR. ELSTON. Of course that is undoubtedly the way it ought to be.

"MR. LARKIN. Well, that is the way we feel it ought to be and we believe—

"MR. ELSTON. But the only thing that is bothering me is whether or not without some explanation of what this language means it might be interpreted to mean that the requirements of this section are directory and not mandatory.

"MR. LARKIN. It is our intention that they be mandatory on the military authorities who have the obligation to hold it, but that as I say a failure to hold it or less than full compliance which does not materially prejudice the substantial rights is not jurisdictional error.

"I agree with you entirely. I was going to volunteer this explanation if you hadn't asked it because it has been a chronic and difficult problem insofar as the military's relations with the Federal courts for the last several years." [House Hearings, supra, pages 998, 999, 1000.]

The absence of court-martial *jurisdiction* may not be the subject of waiver. United States v. Garcia, 5 USCMA 88, 17 CMR 88. However, since failure to effect a pretrial investigation

does not affect jurisdiction, it is certain that its absence may be waived. Moreover, no difficulty is found in holding that an accused is bound by the rules set out in the Manual for Courts-Martial concerning such a waiver. In paragraph 67b, the Manual states:

". . . Defenses and objections based on defects in the preferring of charges, reference for trial, form of the charges and specifications, investigation, or other pretrial proceedings other than objections going to the jurisdiction of the court or the failure of the charges to allege an offense may be raised only by a motion for appropriate relief before a plea is entered. Failure to present any such objection prior to plea constitutes a waiver thereof, but the court for good cause shown may grant relief from the waiver."

In the case at bar, the defect complained of was *not* raised by the defense prior to the entry of a plea, nor was it relied on at any time as a basis for relief other than that granted by the law officer. Accordingly, there can be no reversal here based on the claimed defect in the pretrial investigation. United States v. McCormick, 3 USCMA 361, 12 CMR 117. Cf. United States v. May, 1 USCMA 174, 2 CMR 80; United States v. Rhoden, 1 USCMA 193, 2 CMR 99.

Were one to go further and assume not only that the pretrial investigation before us was characterized by error, but also that it had been properly raised, the findings in the instant case would nonetheless remain unaffected. Distinctly implicit in the discussion of Article 32(d)—as well as the Supreme Court's opinion in Humphrey v. Smith, supra—is the assumption that a conviction by court-martial shall not be reversed by reason of circumstances connected with the pretrial investigation, in the absence of a fair risk that the accused was injured materially by the error. This same view inheres in paragraph 69c of the Manual, which states that:

". . . A substantial failure to comply with the requirements of 34

and Article 32 may be brought to the attention of the court by a motion for appropriate relief. Such a motion should be sustained only if the accused shows that the defect in the conduct of the investigation has in fact prevented him from properly preparing for trial or has otherwise injuriously affected his substantial rights. If the motion is sustained the court may grant a continuance to enable the accused to prepare his defense properly, or may adjourn the proceedings to permit compliance with 34 and Article 32 and report the basis of its action to the convening authority. The latter may, after taking necessary action to cure the defect, return the record to the court with instructions to proceed with the trial."

Nothing inconsistent with this is found in United States v. Schuller, 5 USCMA 101, 17 CMR 101. There a majority of this Court was convinced that errors committed in connection with the investigation—and later with the trial itself—did in fact injuriously affect Schuller's substantial rights. Of course, when a failure to comply with the requirements of Article 32 operates to prejudice rights of this quality, "this Court may reverse for prejudicial error without regard to whether it touches jurisdiction." See United States v. Rhoden, supra.

One need not pause to discuss whether there exists a presumption that the accused *was* prejudiced through a defect in the Article 32 proceeding, or whether, on the other hand, it rests with the defense affirmatively to show harm. Under either rule, it is clear beyond peradventure that the accused was uninjured in the present instance. Inadequacies in the pretrial statements taken by Captain Smith could have prejudiced him, only if omissions therein had been brought to the court's attention as a basis for an inference that his testimony at the trial amounted to a recent fabrication. Instead, the statements were not offered in evidence, and the law officer barred cross-examination of the accused based thereon. This ruling averted all danger of prejudice.

IV

The accused insists that he was materially harmed by the reference of his case for trial one day prior to the submission of the staff judge advocate's written advice dealing with the two charges against him. It would seem that this contention is devoid of substance, since the staff judge advocate's action was affirmative in nature, recommended trial, and informed the convening authority that the evidence was sufficient to support the charges. Moreover, an interval of seven days elapsed between May 6, the date of the written advice, and May 13, that on which the hearing opened. This interval certainly afforded the convening authority a sufficient opportunity to weigh his original decision in light of the written advice received from his staff judge advocate—this, although that advice had differed, as it did not, from the convening authority's initial determination. Certainly the convening authority was aware during this period that the case remained pending—for on May 12 he substituted on the court a new law officer for specific use during the trial of this accused.

Equally important, it is to be observed that no sort of motion was made at trial based on the tardiness of the staff judge advocate's advice. Accordingly, previous comments contained in this opinion with respect to the waiver of defects in the Article 32 investigation are apposite. Indeed the sound core of reason behind one aspect of the notion of waiver is peculiarly apparent here—for it is quite possible that, had the objection been raised at trial level, the Government might have been able to show either that the written advice was misdated and had in fact preceded the order referring the charges, or that the staff judge advocate had verbally and in detail advised the convening authority before the charges had been referred. In addition—and conceding error in the time of submission of the staff judge advocate's advice—this could have been corrected readily before the trial proceeded.

**635**

Article 22 of the Uniform Code enumerates those officials who are empowered to convene general ■■■■■■■ ■ courts-martial. The Special Orders appointing the present court emanated from an officer who fell safely within the authorization of this Article. However, a further complaint of the accused here relates not to the manner in which members were placed on the Special Orders involved, but instead to the fact that exactly one-half of them were excused from attendance by action of the staff judge advocate, his executive officer, or some other official apart from the convening authority.

Certain distinctions must be taken at the outset. Several cases passed on by service boards of review have had to do with instances in which extremely large courts were appointed by convening authorities—with only a fraction of the membership present when trial began. An example of this situation is found in United States v. Holt [CM 357002], 8 CMR 360, pet for review den, 2 USCMA 688, 8 CMR 178, where the record revealed that, of the fifty-one officers named to the court, only seven were present when the trial of the accused opened. Reasons for the absence of the remaining forty-four were not reflected in the record. However, the board held that—failing proof to the contrary—it must be concluded that the numerous absences were based on excuses lawfully approved by the convening authority. Accord: United States v. Shaull [CM 359571], 10 CMR 241, pet for review den, 3 USCMA 821, 11 CMR 248; United States v. Goff [CM 362083], 10 CMR 255; United States v. Hinton [CM 361583], 10 CMR 273, pet for review den, 3 USCMA 815, 11 CMR 248. Unlike the situation in these cases, the present record contains (1) an affirmative explanation of the absence of the missing members of the court, and (2) a vigorous protest against those absences entered by defense counsel at the trial level.

In United States v. Moses [CM 363294], 11 CMR 281, a board of review considered the record of a trial which contained positive evidence of the reasons for the absence of a substantial majority of the thirty-one officers appointed to the court-martial by the convening authority. Six members were not requested to attend by trial counsel, because they had served as members of a court which had tried an accomplice of the accused. Seven were requested to attend, but had notified trial counsel that they were unable to do so—and so appear to have been excused by the latter. Eleven members had not been notified of the trial. In reversing, the board discerned immediately that the situation before it was wholly different from that found in United States v. Holt, supra—where no sort of evidence was offered to shatter the presumption that the missing members properly had been excused by the convening authority. The board concluded that no trial counsel may be permitted—in effect—to excuse from attendance through failing to notify court members of a prospective trial. Accord: United States v. Perry [CM 369909], 14 CMR 434. It also inclined to the view that even to delegate to the trial counsel authority to excuse a court member who "has stated proper and sufficient reason for the request to be excused" would constitute prejudicial error.

The Moses case was relied on heavily by appellate defense counsel before us. Here, however, no clear showing was made that Lieutenant Brener, the trial counsel, played any part in selecting the ultimate membership of the court-martial. Neither is there a recognizable indication that he altered his trial schedule in any manner for the purpose of bringing certain accused persons before particular groupings of court members—an improper practice distinctly possible under the staff judge advocate's policy of rotating court duties equitably among appointed members.

At the same time, United States v. Moses is relevant by reason of the emphatic disapproval by the board there of the practice—revealed in the present record—of appointing an outsize court, only a few of the members of which are to be called ultimately

636

to serve during a particular trial. In that case the board commented:

"We wish to add that our reference to the Holt case, supra, does not mean that we approve of the appointment of large courts. We do not. We merely observe that in that case the defense did not at the trial level establish the manner, and by whom, the nonattending members were excused. In connection with the problem of the inadvisability of appointing large courts it should be remembered that the reason for omitting the maximum limitation of thirteen members to the detail (and its erstwhile companion rule that the maximum number be always appointed if practicable) from the 1920 Articles of War was not to permit a larger number to be appointed, but to permit the convening authority to appoint a lesser number. Thus (MCM, 1921, Note 2, page 11):

'Five, six, or seven members actually sitting out of a personnel of 13 appointed may not be at all the kind of court contemplated by the appointing authority in detailing the court whereas if the original detail were of but 7 or 9, then the 5, 6, or 7 actually sitting would be more nearly substantially the same court contemplated in the detail. . . . The experience of the British, who have no maximum limitation on their courts, but only a minimum (British Army Act, secs. 47–49), seems to show that the absence of a maximum tends, in practice, to keep down the number detailed to the court to very little above the minimum, and thereby operates to insure that the court sitting at the trial shall be substantially the same court detailed by the appointing authority.'

"And the rule announced in the 1921 Manual is still salutary (MCM, 1921, Note 1, page 10):

'It is not expected that appointing authorities will usually detail on a general court-martial many more members than the minimum required by the statute. An odd number of members, such as 7 or 9 . . . will ordinarily be detailed, to allow for a few absences and challenges without breaking the legally required quorum of 5.

'While there is no statutory limitation upon the maximum number of members of a general court-martial, appointing authorities will not usually detail more than 9 members; and will not, in any case, unless under very exceptional circumstances, detail more than 13 members.' " [United States v. Moses, 11 CMR 281.]

Another board of review opinion reiterates this understandable distaste for large and patently unwieldy courts-martial. United States v. Andress, 11 CMR 299. See also Air Force Military Justice Circular, paragraph 403(4), July 31, 1953. The board in Andress noted that:

". . . the practice of appointing large courts and excusing a majority of the members *may* operate to the prejudice of the policy expressed in Article 25(d)(2), UCMJ, that:

'When convening a court-martial, the convening authority shall appoint as members thereof such persons as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service and judicial temperament. . . .' "

And its opinion added that:

". . . the appointment of courts of large membership lessens that dignity that should clothe courts-martial, in that it gives the appearance that the convening of the members (who are called to sit) is a casual affair accomplished on the basis of convenience, *immediate* availability and expediency. It is subject to speculation, criticism and *possibly* attack as not consonant with the spirit of the law in the appointment of courts-martial. Whether the substantial rights of an accused are prejudiced by the practice will depend upon the facts, as disclosed in the record, in each individual case."

In light of the reasoning voiced in the Moses and Andress cases, it is probable that a substantial question of reversible error would have existed had it been shown that the convening authority had specifically delegated to his staff judge advocate—or the latter's executive officer—the power both appear to have wielded in excusing court-martial members. It is notable, however, that, while there was unchallenged testimony that this authority was exercised customarily by one or other of these functionaries, there was no slightest showing that the convening authority had in fact granted it to them. Furthermore, although the convening authority had been aware that, in the past, appreciable numbers of court members had been excused from attendance prior to trial, he might well have been ignorant of the fact that this result had been brought about by a practiced failure to notify them of scheduled trials—that is, that they had been excused, not on the basis of unavailability, but solely because of the staff judge advocate's decision to distribute the burdens of court service equitably.

It has been suggested that a presumption of regularity may be invoked to establish that the convening authority had, in fact, delegated this power to his staff judge advocate. However, to adopt this presumption is also to infer that the convening authority had acquiesced in the studied practice of appointing unnecessarily large courts-martial—under a scheme by which only a fraction of the membership was to be called for a particular trial. This, in turn, would involve an inference that the convening authority had engaged in a procedure specifically and vehemently reprehended by service boards of review—with the result that the suggested presumption becomes, if anything, one of *irregularity* rather than its converse.

Moreover, it seems anomalous on its face—and distinctly disorderly—that a convening authority would, by formal written order, detail fourteen court-martial members to sit during a trial; yet at the same time, as appellate Government counsel would have us believe, would inform his staff judge advocate

that the latter was not required to call to this duty one-half of these duly appointed members, if he did not see fit. Before the law officer—after defense objection—could properly conclude that this unusual action had, in fact, been taken, it seems that it should be required that the Government submit proof, rather than invoke presumptions, and ones of dubious application into the bargain.

Two final contentions must be disposed of. One runs to the effect that the absences of the seven court members in the case at bar were "unauthorized" within the Manual provision to the effect that unauthorized absence of court members before arraignment does not prevent proceeding to trial. Paragraph 41$d$(3). However, it seems clear that this passage was intended to apply to failures to appear due to the error or misconduct of *appointed members*, rather than to cope with the problem created by wholesale absences under an irregular scheme involving the granting of excuses by subordinate officials concerned with military law administration.

The remaining contention suggests that the accused cannot have been prejudiced, since he was tried by a court composed of seven officers, who could decide his case as lawfully and as fairly as fourteen. Apropos in this connection is the statement found in the 1921 Manual, and quoted by the board of review in United States v. Moses, supra, that "Five, six, or seven members actually sitting out of a personnel of 13 appointed may not be at all the kind of court contemplated by the appointing authority in detailing the court." The reduction by one-half in the number of persons legally charged with the duty of passing on the accused's guilt or innocence simply constitutes a change too fundamental to be overlooked—that is, to be shrugged off here as harmless error. To be sure, it is conceivable that the accused might have been found guilty under both charges, had he been tried by the fourteen officers directed to hear his case, whereas—having been tried by the fragment notified—he was, in fact, acquitted of one offense. However, he

might instead have been found *not guilty* of both. One cannot speculate in this area with safety—and, under the circumstances, a rehearing must be directed.

## VI

Grave misgivings must be expressed concerning the propriety of the delegation by a convening authority to his staff judge advocate of a power to excuse which is wholly independent of an exempted court member's practical availability. It is possible—although not certain—that the present case furnishes an example of this dubious practice. Indeed, the record makes clear that no attempt was made in the case of the absent seven to learn of the existence of pressing duties which would interfere with their court-martial service; nor does it appear that investigation was conducted by the staff judge advocate to determine whether any sort of minor official or personal inconvenience would have resulted, had the excused members been required to attend. If this broad power was, in fact, delegated to his staff judge advocate by the convening authority here, it is genuinely doubtful that his action would have accorded fully with the Congressional intendment that a convening authority must choose the basic composition of courts-martial assembled under his aegis. Error in this regard—if error it is—would not touch jurisdiction, but might well necessitate reversal.

Lest it be asserted that the convening authority will be unduly confined, an emphatic denial must be entered—supported by several observations. In the first place, the rotation of court duties—for which the present staff judge advocate seems to have been striving—could have been accomplished with equal facility through the appointment of two normally manned courts, under a plan calling for an alternate reference of cases. Secondly, no doubt is entertained that a convening authority may validly delegate to his staff judge advocate, to the president of the court-martial, or to any other impartial official person, the power to excuse appointed court members *for good cause*. Under this grant of power, the approval of an excuse submitted by a member would import a genuine exercise of discretion as to the existence of other official duties, or similar circumstances, which serve to raise a conflict with prospective court service.

Next, even in the case of an unnecessarily sizeable court, like the one found here—or, for that matter, the tribunal of fifty-one members found in United States v. Holt, *supra*—its findings would be unassailable, if no question were raised prior to plea concerning the excuse of personnel. Indeed, this might lawfully be made the subject of pretrial agreement between the defense and the staff judge advocate, or even between the former and trial counsel. Of course, this last alternative is not to be favored—insofar as it involves the appointment of large, patently unwieldy courts—but no positive legal error can be discerned. A number of service boards of review have taken this same position.

Fourth, as to situations similar to the one at bar—where the manner of assembling the court is challenged by the defense before entry of a plea—the matter may be brought to the attention of the convening authority by trial counsel or the law officer. Should he then ratify the action taken earlier by another, it seems that his decision would not be open to question, either at trial level or on review. Thus, in the face of the numerous alternatives available for use in avoiding an interference with the performance of other duties, and like good cause, there is little reason to strain to support a distinctly loose and disorderly administration of court-martial convention—a laxity which has earlier been decried vigorously within the military establishment itself.

## VII

It follows from what has been said that a rehearing must be ordered.

QUINN, Chief Judge (concurring in the result):

I concur in the result.

The pretrial investigation and the

pretrial advice of the staff judge advocate are not mere formalities. They are substantial proceedings prescribed by the Uniform Code of Military Justice, and they constitute the military equivalent of essential pretrial procedures which obtain in the civilian community. See Talbott v. Toth, 215 F2d 22 (CA DC Cir 1954). A departure from the Code in the matter of these pretrial procedures will not make all subsequent proceedings null and void; but, in an appropriate case, a failure to adhere to the Code may constitute a ground for setting aside a conviction. Humphrey v. Smith, 336 US 695, 696, 93 L ed 986, 69 S Ct 830; United States v. Schuller, 5 USCMA 101, 17 CMR 101. See also Manual for Courts-Martial, United States, 1951, paragraph 34, page 45.

The claim of error in the pretrial investigation has no merit. The accused must be charged with the consequences, if any, resulting from the alleged omission in his statements to the investigation officer. The statements were short. They were personally signed by the accused. Presumably he read them. In fact, he does not contend otherwise. Hence, he certainly knew there were omissions. Yet, he chose to submit the statements, without addition or change. In effect, he changed his mind and decided to say nothing about the omitted details. As the accused, he had a right to say as much or as little as he desired. Having expressed his desires on two separate occasions, he cannot change his mind again after the trial, and advance the purported omissions as a basis for a claim of error.

As for the pretrial advice of the staff judge advocate there may have been, as suggested by Judge Brosman, no prejudicial violation of the Uniform Code. The date of the advice indicates that it was submitted after, rather than before, reference of the charges to trial. However, a proper advice was, in fact, prepared before the charges were served upon the accused. If the advice was actually submitted to the convening authority, he would have had before him the staff judge advocate's professional examination of the expected evidence and his impartial opinion as to its sufficiency to support the charges. Cf. United States v. Schuller, supra. The staff judge advocate's evaluation of the evidence and recommendation were in accord with his own appraisal of the investigation report. Under these circumstances there would have been no need for the convening authority to go through the "empty and useless gesture" of recalling his earlier order of reference for the sole purpose of reissuing it under a later dateline. United States v. Self, 3 USCMA 568, 572–573, 13 CMR 124. Since there is other prejudicial error, however, I need not decide whether this Court may properly assume either that the staff judge advocate's advice is wrongfully dated or that it was submitted to the convening authority at an appropriate time.

Turning to the question of court membership, in my opinion, the power to excuse from attendance is an integral part of the power to select. It may, as in this case, actually control the membership of the court. Hence, the power to excuse should be exercised personally by the convening authority. Article 29 of the Uniform Code, 50 USC § 593, expressly recognizes this requirement. It prohibits absence or excuse after arraignment except for physical disability, challenge, or "by order of the convening authority for good cause." See also Manual, supra, paragraphs 37c, 41c. If a member is absent without excuse by the convening authority, the accused may object to further proceedings. However, if he does not object, unauthorized absence of a member will not deprive the court of the right to proceed. The Manual sets out the applicable rule as follows:

"(3) *Before arraignment.* — The unauthorized absence of a member of a general or special court-martial from a session of the court may be a military offense, but his absence prior to the arraignment of the accused will not prevent the court from proceeding with the trial if a quorum is present. However, the trial counsel will report any unauthorized absence of a member to the convening au-

thority." [Manual, supra, paragraph 41d(3).]

In this case the defendant objected. Thus, he preserved his right to be tried by a court composed of members appointed by the convening authority not lawfully absent or excused. It matters not that the evidence establishes his guilt. He is entitled to be tried in accordance with the requirements of the Uniform Code. He was deprived of that right. He is, therefore, entitled to a rehearing. Accordingly, I concur in setting aside the findings of guilt and ordering a rehearing.

LATIMER, Judge (dissenting):

I dissent.

I concur generally with the principles announced in the first four subdivisions of Judge Brosman's opinion. In addition, I join in some of what he says on the court selection issue. I, too, inveigh against efforts to escape the administrative burdens of the Code when those which are adopted lend themselves to a possibility of abuse. However, to reverse a conviction, I believe it necessary to find something more than a plan which, when extended to its greatest coverage, might operate to the detriment of an accused. In theory, it can be argued that if a convening authority can name 14 officers as members of a court-martial and permit his staff judge advocate to select any seven for the purpose of equalizing the load, then he can name 51 others, as was done in United States v. Holt [CM 357002], 8 CMR 360, pet for review den, 2 USCMA 688, 8 CMR 178, or even every officer in a corps and permit his legal department to wield the same power of selection. I accept that argument but suggest that the greater the number to select from, the greater the opportunity for abuse, and the lesser the number to deal with, the less the chance to select only those members favorable to the Government. Here, we do not have an excessive number, but, as the author of the principal opinion points out, there was little necessity to adopt the particular form of expedient as it is a relatively simple matter to create two courts. As a matter of simple construction, the plan used was, in effect, no more nor less than that, with the identity of the particular officers to hear each case uncertain until notified of their duty to serve. To say the least, the flexibility sought in this instance could well be sacrificed for the certainty found in definite orders for each court. While I strive to support a streamlined procedure, I believe it advisable for those charged with the administration of military justice to stay out of questionable areas, and there is some merit in the contention that this expedient may invade those fields.

My reason for departing from the views of my associates can be found in my belief that a cause should not be reversed because of my distaste for the means employed. I believe it necessary to go one step further and seek to determine if the practice adopted denied a substantial right or privilege to the prejudice of the accused. In the case at bar, if he was denied either, and it was granted to him by the Code or Manual, or by their fair implication, then he has been harmed. I find no such deprivation and, in an effort to support my view, I offer the following reasons.

Contrary to my associates, I must conclude that the plan in effect was known to and approved by the convening authority. According to the testimony produced in an out-of-court hearing, the method of selection had been used for some period of time in the Corps, and it involved a major policy in administering military justice in that command. I do not believe a Corps staff judge advocate would conceive and put in operation any such method without having obtained the consent of his commanding general. A commander alone is responsible for all his unit does or fails to do, and he, not his staff, makes the policy decisions. As a corollary to that, any staff officer worth his salt must keep his commander informed, and, if possible, secure approval beforehand of any plan of operation that may invade that field. Particularly is that true when time is not of the essence. Moreover, it is worth noting that the order on its face shows that seven members selected for the court were regularly assigned as mem-

bers of Corps Headquarters, and the Corps commander would not be unfamiliar with the employment of his staff officers over a span of days or weeks. Furthermore, he must have been required to approve the findings in a number of cases in which the same procedure had been used, and he would, indeed, be very careless or indifferent in a sensitive area if he was ignorant of the means that were employed in selecting court personnel. One item alone would undoubtedly prompt inquiry on his part. Why would a commanding general issue a special order detailing fourteen officers, including some of his working staff, for a task that only required five? The only purpose that I can possibly see in selecting that unusual number would be to permit a breakdown into two panels of uneven numbers with some latitude for necessary absences. Since passage of the American Articles of 1786, the maximum number of officers mentioned as necessary to man a general court has been thirteen, and it would be unreasonable to assume that an officer with many years of military experience would detail an even number of court members in excess of that well-known figure unless he had a deliberate purpose for so doing. I believe the purpose was to tailor the order to fit the expedient, and, of course, if the commanding general selected or authorized the selection of the fourteen members named on the order, and I am bound to infer he did, he would be informed of the reason for so doing. To hold otherwise would require me to assume that the commanding general and his staff judge advocate operated in separate compartments and never discussed an important aspect of military justice. So far as Army staff doctrine is concerned, a staff judge advocate communicates directly with the commanders in matters relating to the administration of military justice, and I have every reason to assume that this headquarters followed that rule. Certainly, if I need enter the field of presumptions, I am not going to presume a violation of a fundamental and well-understood command and staff principle. On the contrary, I presume regularity

on the part of both the commander and the staff officer, and there is no evidence in this record which in any way undermines that presumption. I can well understand why there is no evidence in the record touching on that question because I believe that no one at the trial level would conceive of the idea that the General was unaware of the method employed.

Having placed the responsibility for the plan on the shoulders of the commanding general, I move on to discuss the question of whether it effected a denial of any right or privilege running to the accused. In that connection, I am willing to join the Chief Judge to this extent. If the accused was entitled to require the convening authority to personally select the members of the court and personally excuse those not attending, then this cause should be reversed. For reasons which I will hereinafter express, I conclude he is entitled to the former as a matter of right, but not the latter. Phrased in different parlance, I believe the convening authority cannot delegate the selection of members of a court, but he can delegate to his staff judge advocate the power to excuse those he has selected.

There are certain articles of the Code which cast some light on this subject. First, as to selection of members, Article 25(d)(2) of the Code, 50 USC § 589, provides:

"When convening a court-martial, the convening authority shall appoint as members thereof such persons as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament."

In addition to appointing the members, the law officer, trial and defense counsel must likewise be selected and appointed by the convening authority. From the wording of Article 25(d)(2) and the other Code provisions, I reach the conclusion that the selection of members of a court must be based on the personal opinion of the convening authority and that the opinion of a substitute is not acceptable. Undoubted-

ly Congress, by enumerating those officers qualified to convene courts, intended that they alone should determine the members' qualifications, and that staff members or delegated officers should not be permitted to exercise their independent judgment.

In addition to the Articles of the present Code, the Manual and military precedent establish clearly that this is a non-delegable duty. Winthrop in his Military Law and Precedents, 2d ed, 1920 Reprint, page 67, states the rule as follows:

> "*Delegation of the authority. As* the Article expressly designates certain particular commanders as competent to order general courts for armies, divisions and departments, it follows, upon the principle of *expressio unius exclusio alterius,* that no other commanders or officers shall be so authorized. A commander of a division, department or army cannot therefore delegate to an inferior commander or to a staff officer the authority vested in himself by this Article, or authorize such officer to exercise the same, *for him,* in his temporary absence or otherwise."

That the rule announced by Winthrop has not been modified or changed is established by the provisions of paragraph 5*a*(5) of the Manual. I quote its provisions:

> "As Article 22 expressly designates those who have authority to convene general courts-martial, it follows that no one else has this authority and that anyone having this authority cannot delegate or transfer it to another. The authority of a commanding officer to convene general courts-martial is independent of his rank and is retained by him as long as he continues to be such a commander. The rules as to the devolution of command in case of the death, disability, or temporary absence of a commander are stated in departmental regulations."

Because the power to appoint cannot be delegated, it does not follow that the authority to excuse it so circumscribed. As a matter of statutory construction, supported by the exigencies of the military service, I come to an opposite conclusion. The Code deals quite specifically with the power to appoint, but in connection with the authority to excuse it leaves an area of freedom to the commander. By a comparison of the Code and the Manual provisions on the authority to excuse with those previously quoted on the duty to select, I shall attempt to point out why different principles operate in the two fields. By way of preface to my development, I ▮▮▮▮▮▮▮▮ generalize by saying that different rules apply in excusing members before and after arraignment.

There is only one codal provision touching on the power to excuse, and it is found in Article 29(*a*) of the Code, 50 USC § 593. That Article states:

> "No member of a general or special court-martial shall be absent or excused after the accused has been arraigned except for physical disability or as a result of a challenge or by order of the convening authority for good cause."

It is to be noted the Article carefully mentions that good cause must be found to exist before the member can be excused, but that proscription applies only after arraignment and not before. By following a rule of statutory construction, inclusion in the Code of the phrase "after arraignment" causes me to believe that Congress intended to broaden the base for dealing with court members before arraignment. Unless there was to be some difference, it would have been unnecessary for Congress to have used the arraignment as the starting point. In this instance, the accused had not been arraigned at the time the members were excused, and so I find the Article does not apply.

My construction of Article 29 of the Code is supported by various paragraphs of the Manual. Throughout its provisions, a clear line of cleavage between the relief of court-martial members before and after arraignment is visible. The limitations imposed on convening authorities and on court

members are tightened after arraignment and relaxed prior thereto. In order to approach the subject in an orderly manner, I will first quote the paragraphs influencing the actions of the convening authority before arraignment and then those operative after arraignment. Paragraph 37a provides as follows:

"Subject to the exceptions stated below (37b), it is within the discretion of the convening authority to make changes in the composition of courts-martial appointed by him. For instance, he may appoint new members to a court in lieu of, or in addition to, the members of the original court; or he may appoint a new law officer, trial counsel, or defense counsel in lieu of the personnel designated to perform those respective duties by the original appointing order. When practicable, the convening authority should change the composition of courts-martial from time to time to provide the maximum opportunity to eligible personnel to gain experience in the administration of military justice."

When these provisions are compared with his powers after the plea, it becomes apparent that his powers have been circumscribed once the arraignment has been completed. Paragraph 37b of the Manual, which restates Article 29(a) of the Code, says:

"No member of a general or special court-martial shall be absent or excused after the accused has been arraigned except for physical disability or as a result of a challenge or by order of the convening authority for good cause (Art. 29a). Military exigencies or emergency leave, among others, may constitute good cause for such a relief. The determination of facts which constitute good cause for the excuse from attendance or the relief of a member after arraignment rests within the discretion of the convening authority."

I now pass on to show how the Manual views the absence of a member of the court-martial. Again, more significance is attached to an absence during

trial than one occurring before the hearing commences. It is to be noted that a contemplated absence before the session of court because of physical disability need only be reported to trial counsel who is enjoined to make an informal inquiry. Paragraph 41c deals with the subject in the following language:

"If he is able to do so, a member of a general or special court-martial who is, or has reason to believe that he will be, absent from a session of the court because of physical disability will so inform the trial counsel. The latter will make an informal inquiry to verify the cause of the absence and, if it occurs after the arraignment of the accused, will report his findings to the court (41d(4))."

Moreover, an unauthorized absence before arraignment does not affect the legality of the proceedings. This is held to be the rule by paragraph 41d (3), which states:

"Before arraignment. — The unauthorized absence of a member of a general or special court-martial from a session of the court may be a military offense, but his absence prior to the arraignment of the accused will not prevent the court from proceeding with the trial if a quorum is present. However, the trial counsel will report any unauthorized absence of a member to the convening authority."

I find a substantial difference after arraignment because then the court-martial may proceed only if the member is absent for one of three reasons, i.e., (1) challenge; (2) physical disability; and (3) order of the convening authority for good cause. That such is the law of the Manual may be gleaned from the contents of paragraph 41d(4):

"After arraignment. — If a member who was present at the arraignment of the accused is absent from a future session of the court in the same case, the court may proceed only if a quorum remains and the absence is the result of a challenge, physical disability, or the order of the convening authority for good cause."

644

The net of my arguments reinforced by the statements quoted from the Code and the Manual is simply this: After the court personnel have been selected and prior to arraignment, the proceedings have a flexibility which does not demand the same personalized decisions by the convening authority as are imposed after the trial commences. A convening authority is not so closely hedged in by legal niceties during the preliminary skirmishes. However, once the battle has begun, he cannot, without any reason or justification, change the membership of the court. After the plea, the number and identity of the members become fixed, and the accused may be entitled to complain if there is a change which does not have as its base a personal finding by the convening authority that good cause exists for the change in membership. That, however, is a decision I need not make with certainty at this time.

I specifically point up the differences outlined above to show that while the Code and the Manual generally keep the convening authority in a procedural strait-jacket while he is selecting the personnel for the court, and perhaps after the trial has begun, they do not require that between the time the members are selected and the arraignment of the accused he, and he alone, make the other decisions. Surely, if the Manual permits trial counsel to accept reasons for absences before trial, there is no good reason why the staff judge advocate, who has no power of command and who can act only for the commanding general, cannot do the same. While this argument meets the issues posed in this instance obliquely, it supports my belief that expedients taken after the selection of members but before trial need not be viewed through the same spectacles to be used when the same expedient is adopted following the arraignment.

This brings me to the point where I must indulge in one of two presumptions, and it becomes necessary to establish that a principle founded on either does not deny the accused any substantial right. The first presumption is to the effect that the convening authority personally approved the selection of the particular members who were notified to sit on this particular case and hear this issue. I have no doubt that he could do that in an informal manner and, of course, if he did, then I believe every right and privilege granted to the accused has been given to him.

The second presumption to be considered here involves the delegation of the power to the staff judge advocate to panel the court members. While I have previously asserted that the commanding general was fully aware of the operational features of the plan, I do not contend that prior to trial he was personally informed of the identity of the seven members selected for this particular case, although that is not beyond the realm of reason. I must, therefore, assume that he delegated the power to select the seven members to his staff judge advocate. I find no reason to hold that this is a non-delegable power. A staff judge advocate has, by regulation, the authority to carry out the plans and policies of his commander once they are announced, and this would include the power to determine the conflicting interests between a selected officer's basic duty and the duty of being a member of a court-martial. Furthermore, if the delegation of authority to the staff judge advocate was limited to equalizing the time spent on court-martial duties, that would be no more than granting the power to perform the ministerial act of spreading the work load. Certainly, I believe we are erecting unnecessary obstacles to the primary responsibility of a commander to hold he must personally approve every request by a court-martial member to be excused from sitting on a particular case. Particularly would that be true under wartime conditions as he may be some distance removed from the situs of the court-martial, means of communication may be clogged, the officers may be scattered, and more important duties may be fully occupying his time. Even during peacetime, he should be permitted to rid himself of those administrative duties which are not specifically made non-delegable by military law. Only if I were to find that Congress or

the President denied a commanding officer the authority to delegate the power to excuse members of the court before arraignment, would I prevent him from passing that burden on to his staff judge advocate. Accordingly, I would find that the plan adopted here was not prohibited by the Code or the Manual, whether it was operated personally by the convening authority or by the staff judge advocate.

The plan can be tested for error by a different method. This means consists of isolating the rights or privileges granted this accused and then determine which one, if any, was denied him. As I interpret the Code and the Manual, he had a right to require the convening authority to select the members of his court-martial as that selection involves a personal opinion of the commander as to the members' qualifications. In this instance, every member of this court was so selected. He had the right to be tried by five or more officers. This court was composed of seven. He had the privilege to be tried by those members who were sitting when he was arraigned, and he was not denied that privilege. He had the right to have trial counsel, the law officer, and defense counsel appointed to the court by the convening authority. That right was not abridged. What, then, has been denied the accused which my associates find of such importance as to justify a rehearing? Converging the principles announced in their separate opinions, it must be that the accused was shorn of the right or privilege to demand that the convening authority personally approve the absence of any officer not present at the time of trial. I dispute that he had any such right and to state that contention is to prove its absurdity. If, after having selected the members of the court and after having determined their qualifications to act, the commanding general is charged with personally making every decision affecting their presence or absence, the whole concept of command and staff is cast aside. Authority to administer details can be delegated, but responsibility cannot. Here the convening authority could not escape the legal effect of his delegation, but he could authorize the staff judge advocate to take the necessary steps to carry the plan into execution. Singularly enough, Judge Brosman concludes that had the objection registered by the accused been called to the attention of the convening authority and had he overruled the objection and placed his imprimatur on the court as selected, we would affirm the case. Of course, the Corps Commander did exactly that when he affirmed the findings and sentence as the irregularity, if such it be, was specifically dealt with by the staff judge advocate in his report to him. But more to the point, if the commanding general could ratify the proceedings after an objection had been made, he could authorize them in the original instance.

To avoid any suspicion that the procedure was adopted to assist the prosecution, I mention the following facts and circumstances. There is no contention that any member of the court was prejudiced against the accused. Furthermore, there is no assertion that the members were handpicked because they were prosecution-minded or would not give the accused a fair and just trial. No challenges for cause were asserted, and the right to a peremptory challenge was not exercised. In the final analysis, the sole contention made is that the procedure adopted was not in strict conformity with the Code or the Manual. Assuming the expedient was not the better part of wisdom, it amounts to no more than a mere irregularity which did not prejudice the accused.

I would, therefore, affirm the decision of the board of review.