UNITED STATES, Appellee

v

CLEO J. SUMMERS, Private First Class, U. S. Army, Appellant

13 USCMA 573, 33 CMR 105

No. 16,334

March 29, 1963

*Captain George C. Ryker* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel Ralph Herrod, Captain David M. Gill,* and *Captain Ronald L. Gainer.*

*Captain Peter J. McGinn* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Francis M. Cooper* and *Stanley M. Wanger.*

## Opinion of the Court

QUINN, Chief Judge:

The accused contends his conviction for a number of offenses, including larceny and two specifications of housebreaking, should be reversed because evidence obtained as the result of a search of his automobile was improperly admitted.[1]

At the threshold of the accused's claim of error is the effect of a ruling made on that same point in the earlier trial of Private First Class Raymond E. Owens, who was apprehended with the accused and tried for some of the same offenses. In Owens' case, the law officer ruled that the search was illegal. The question, then, is whether that ruling was binding on the law officer in this case.

---

[1] The approved sentence includes a dishonorable discharge and confinement at hard labor for three years.

574

Determination of the validity of a search may involve a decision on disputed questions of fact, but the ruling is not a final judgment; it is merely an "evidentiary ruling." United States v Koenig, 290 F2d 166, 170 (CA 5th Cir) (1961), affirmed, 369 US 121, 131, 7 L ed 2d 614, 82 S Ct 654 (1962). A ruling by a judge on the admissibility of evidence in one proceeding against another person, is not binding on another judge in a separate proceeding, although the same evidence may be presented in both cases; as an evidentiary ruling, it is "no more than a procedural step . . . [and] the effect of the decision . . . [does] not extend beyond that case." United States v Wallace & Tiernan Co., 336 US 793, 802, 93 L ed 1042, 69 S Ct 824. See also United States v Koenig, supra; cf. United States v Smith, 4 USCMA 369, 15 CMR 369. Consequently, the law officer in this case was free to evaluate the evidence presented to him, and to make such ruling as was warranted by the evidence.

Judicial authorities should be vigilant to protect a person against arbitrary intrusion into his privacy by police officers, and to refuse to the police the right to use, in the courtroom, evidence obtained by illegal or unconscionable means. Silverthorne Lumber Co. v United States, 251 US 385, 64 L ed 319, 40 S Ct 182 (1920); Ellison v United States, 206 F2d 476 (CA DC Cir) (1953). The right of the individual to be free from capricious police interference is not, however, designed to be an "oppressive weight on law enforcement officers." United States v Jeffers, 342 US 48, 51, 96 L ed 59, 72 S Ct 93. Under the Fourth Amendment to the Constitution of the United States, a search of a person's personal effects is unlawful only if it is unreasonable. "[F]air leeway for enforcing the law in the community's protection" must be accorded to a police officer engaged in the execution of his difficult duties. Brinegar v United States, 338 US 160, 176, 93 L ed 1879, 69 S Ct 1302. Just as the courts require enforcement authorities to make no search except upon reasonable grounds, police officers have the right to expect the courts to be reasonable in judging their responses to particular situations. The judicial evaluation of the police officer's conduct should be predicated on the "total atmosphere," not as it appears to a legal technician, but as it appears to a reasonable, prudent and responsible officer. United States v Rabinowitz, 339 US 56, 66, 94 L ed 653, 70 S Ct 430, 435 (1950); United States v Walker, 307 F2d 250 (CA 4th Cir) (1962). We turn, therefore, to the "total atmosphere" of the case.

On Wednesday, October 4, 1961, First Lieutenant Robert Henry Fahringer was the Military Police Duty Officer. About 1:30 a.m., accompanied by the driver of his police sedan, Private First Class Felix Ramon, he set out to supervise generally the military patrols at Fort Carson, and specifically to conduct "security checks" on "the PX's." Earlier, at the patrol briefing, Fahringer had instructed the patrols "to pay particular attention to the parking lots behind PX's." The instruction was prompted by a series of serious crimes committed in the preceding week. Among these were a breaking into one of the branches of the Post Exchange and the theft of a substantial quantity of merchandise, and a breaking into a weapons storeroom and the theft of four .45 caliber pistols and two rifles. In the course of the tour, Fahringer circled one of the exchange branches. As he entered the parking lot in the rear of the building he saw a parked, two-door car, with two occupants "slouched" down in the front seat seemingly asleep. "Prompt[ed]" by his "aware[ness]" of the earlier offenses, the Lieutenant directed Ramon to stop. Ramon halted the police sedan, with its headlights on the parked car. He got out of the police vehicle, walked to the other car, and knocked on the window of the door on the passenger's side. When he had attracted their attention, he indicated to the occupants that they were to get out of the car. The accused got out on the driver's side, and Owens got out from the passengers' side. Each left the door on his side open. Ramon told the accused and

Owens to stand in front of the headlights of the police sedan. Owens was dressed in civilian attire, but the accused wore a uniform. As they entered the headlight beams, Lieutenant Fahringer called to them to show their identification cards. With Owens turning his head to watch Ramon "because . . . [he] knew those pistols were in the car," they fumbled about their respective persons in an apparent effort to comply with Fahringer's demand. As they did so, Ramon looked into their car.

According to Ramon, he "possibly" put his head and shoulders into the car, and "possibly" his right hand, in which he held a flashlight. He directed the beam of the flashlight to the floorboards of the automobile. Under the seat, on the driver's side, he saw a .45 caliber pistol. He picked up the weapon and called out his discovery to Lieutenant Fahringer, who immediately apprehended the accused and Owens on "suspicion of larceny."

About thirty-six hours after apprehension, Owens confessed to breaking into a "PX" store and into the weapons storeroom. Charges were preferred against him and the accused. Owens' case came up first for trial. His counsel objected to the admission of evidence as to the finding of the pistol, on the ground the search was illegal, and to the admission of a pretrial statement by Owens, on the ground the statement was involuntary, because it was the "fruit" of an illegal search and the result of the coercive conditions of an interrogation to which Owens was subjected. After hearing substantial testimony, the law officer in the Owens case sustained the objection. When the accused's case came to trial, Owens was called as a Government witness. Defense counsel objected to his testimony on the ground it was the direct product of an illegal search and seizure of the pistol from the accused's car. See United States v Heck, 6 CMR 223, 230; People v Albea, 2 Ill 2d 317, 118 NE 2d 277 (1954); United States v Killough, — F2d — (CA DC Cir) (October 4, 1962). The objection was overruled, and Owens was allowed to testify. His testimony established most of the offenses charged.[2]

When a police officer discovers a person at a place, and under circumstances, indicating he is not going about his legitimate business, the officer has the right, and the duty, to investigate. Brinegar v United States, supra. How far can the investigation go? Certainly, if the person is in a parked car, in the early morning hours, in an area which has been the scene of a series of serious offenses, so that it can be described as a "police hazard," the police officer is entitled to ask the occupant of the car to get out and identify himself. People v Davis, 188 Cal App 2d 718, 10 West's Cal Rptr 610 (1961); People v Martin, 26 Cal 2d 106, 293 P2d 52 (1956); Lafazia v United States, 4 F2d 817 (CA 1st Cir) (1925); see also Dickerson v United States, 120 A2d 588 (Mun Ct App DC) (1956). Common sense indicates that the inquiry cannot be limited to inspection of a driver's license or other identification card produced by the person, especially when one of the recent crimes which "prompted" the officer to question the occupants was the theft of deadly weapons. A weapon or a burglar's tool is just as likely to be carried in the car as on the person. See Brown v United States, 30 F2d 474 (CA DC Cir) (1929); Busby v United States, 296 F2d 328 (CA 9th Cir) (1961), cert den 369 US 876, 8 L ed 2d 278, 82 S Ct 1147 (1962). Under the circumstances presented, flashing a light around the interior of the car would be the most natural and reasonable thing to do. Is the act less natural and reasonable if the officer, standing at the open door of a car, puts part of his body into the vehicle as he flashes around his light?[3] We think not.

---

[2] One of the findings of guilty was set aside by the convening authority because of a variance between the pleading and proof.

[3] In stating the question in this form, we are giving the accused the benefit of all inferences, and are assuming that the law officer concluded that Roman

Many courts have held it to be reasonable conduct to look into a car from the outside, when the circumstances justify stopping the car and asking the occupants to identify themselves. Bell v United States, 254 F2d 82 (CA DC Cir) (1958), cert den, 358 US 885, 3 L ed 113, 79 S Ct 126 (1958), pet reh den, 358 US 923, 3 L ed 2d 242, 79 S Ct 292 (1958); Busby v United States, supra; People v McLaine, 204 Advance Cal App 119, 22 West's Cal Rptr 72 (1962); People v Sanson, 156 Cal App 2d 250, 319 P2d 422 (1957); State v Brooks, 57 Wash 2d 422, 357 P2d 735 (1961); Ellison v United States, supra; see also Hall v United States, 235 F2d 248 (CA 5th Cir) (1956). In our opinion, it is just as reasonable for the officer, standing at the door left open by the occupant, to lean inside the car to inspect the interior. In fact, it is more natural and more sensible to do it that way.

Law enforcement is already difficult and dangerous. Courts should not add to the peril by demanding that the police officer depend upon the happenstance of an unobstructed view from an open door to see whether a weapon, or the instrumentality of a crime, is in the place it is very likely to be—and oftentimes is—under the seat of the car. It offends reason and the practical consideration of a policeman's life to say he can reasonably and legally inspect the car's interior from the outside, but is forbidden to put any part of his person into the car while carrying out the inspection. If, under the circumstances, the officers are justified in "patting down" the occupants of a car, as they had a right to do in this case, People v Davis, supra, they were similarly justified in "patting down" the vehicle. In our opinion, Ramon did no more than any responsible police officer would do in the conduct of his duties under like circumstances. See Ellis v United States, 264 F2d 372 (CA DC Cir) (1959), cert den, 359 US 998, 3 L ed 986, 79 S Ct 1129 (1959), pet reh den, 361 US 945, 4 L ed 2d 365, 80 S Ct 407

had part of his body in the car when he looked into it, although there is testimony to support a contrary conclusion.

(1960). The fact that part of his body projected into the car, did not make his action unreasonable and illegal. The law officer, therefore, did not err in ruling that the search was reasonable under the circumstances. Since the search of the accused's car was lawful, it follows that Owens' testimony is not the product of an illegal search.

The decision of the board of review is affirmed.

Judge KILDAY concurs.

FERGUSON, Judge (concurring in the result):

I concur in the result.

Police action must always be carried out within the Constitution, and, if I read the principal opinion correctly, it premises the right to search an automobile upon the reasonableness of particular police action *without regard to whether probable cause existed for the search*. Probable cause, of course, is the proper test for examination of vehicles without warrants, and unless it is found to exist, the search is *per se* unreasonable and illegal. Carroll v United States, 267 US 132, 69 L ed 543, 45 S Ct 280 (1925); Brinegar v United States, 338 US 160, 93 L ed 1879, 69 S Ct 1302 (1949). As was stated in the former case, at page 149:

"On reason and authority the true rule is that if the search and seizure without a warrant are made upon probable cause, that is, upon a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction, the search and seizure are valid."

And in the *Brinegar* case, supra, the same Court declared, at page 175:

"In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of every day life on which reasonable and prudent men, not legal technicians, act. The standard of proof is

accordingly correlative to what must be proved."

Lieutenant Fahringer, the Military Police Duty Officer, was fully aware of the series of breaking and enterings which had recently occurred in local post exchanges and a weapons storage area. He was also aware of the theft of weapons. He observed accused and Owens slumped over in the front seat of an automobile in an exchange parking lot during the early hours of the morning. Accused was dressed in a uniform and Owens in civilian clothing. The men were aroused, and, while Fahringer was properly checking their identification, his assistant, Sergeant Ramon, directed his flashlight into the open door of the car and observed a .45 caliber service-type pistol on the floor, protruding from under the seat. When he made known his discovery to Fahringer, the latter placed accused and Owens under apprehension on suspicion of larceny of the weapon. The vehicle was then thoroughly searched, and another pistol was turned up.

The foregoing facts indicate to me the existence of probable cause to search the vehicle, *i.e.,* "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Brinegar v United States, supra. The men were discovered in a vehicle parked beside an exchange store, located on a military base at which there had been a series of breaking and enterings into such establishments, resulting in the theft of weapons like that which Ramon observed. While routinely checking the identification of these strangers, Sergeant Ramon discovered this service pistol and he did so without in anyway searching the automobile.

Thus, in Smith v United States, 2 F2d 715 (CA 4th Cir) (1924), it was held that turning a flashlight into a car through an open rear door and thereby discovering the presence of illicit whiskey did not constitute a search of the vehicle. As the court remarked, at page 716:

". . . A search implies some exploratory investigation. It is not a

search to observe that which is open and patent, in either sunlight or artificial light."

See also Fisher v United States, 205 F2d 702 (CA DC Cir) (1953) (looking through an open door into a back room); and Safarik v United States, 62 F2d 892 (CA 8th Cir) (1933) (use of flashlight to observe illegal whiskey through chicken coop window).

It was at this point that accused was apprehended, the officers being aware that he and Owens had been found in the vicinity of a post exchange; that there had been previous breaking and enterings, including the one in which service pistols had been stolen; and that a service-type automatic had been found in their vehicle. It seems clear that these known matters were sufficient to allow a reasonable and prudent individual to infer that the two men had participated in the previous offenses and were about to repeat their crime. Thus, under the principles laid down by the Supreme Court, probable cause existed for their apprehension and the search of their automobile.

The same conclusion was reached by the Circuit Court of Appeals in Busby v United States, 296 F2d 328 (CA 9th Cir) (1961), upon facts almost identical to those now before us. In that case, a police officer stopped defendants' car as its taillight was not burning. Another officer arrived on the scene with information tending to indicate that the men may have intended to rob a local bar which they had left shortly before. The officers asked the occupants to step out of their vehicle. When the door was opened and the dome light went on, one of the officers observed a sawed-off shotgun protruding from under the rear seat. The men were arrested, and a search of the car disclosed other loaded weapons, material with which to fashion masks, gloves, flashlights, an electric drill, and adhesive tape. In finding the search legal, the court said, at page 331:

". . . Considering the hour of the morning, the information received and all the surrounding circumstances, the officers were per-

fectly justified in making inquiries of the appellants and in asking them to step out of the automobile. These actions appear to have been proper police practice under the circumstances, and certainly this routine investigation did not constitute an arrest or search.

"The undisputed facts show that when the appellants were asked to step out of the car the dome light went on, illuminating the partially disclosed shotgun. There is no evidence indicating that officer McDonald made any search of the car to find the shotgun or that he in any way entered the car or did anything except to look at what had been revealed in the car when the dome light was illuminated. Seeing the gun gave the officers probable cause to make an arrest and a search for additional evidence."

In like manner, discovery, without a search, of the .45 caliber automatic pistol in this case gave Lieutenant Fahringer and his associates the last link needed to establish probable cause to arrest accused and Owens and to make a search for additional evidence. Accordingly, there was no illegal search and seizure upon which the contention that Owens' testimony was inadmissible could be premised, and I join in the affirmance of the board of review's decision.