UNITED STATES, Appellee

v

GARY M. DREW, Airman Basic, U. S. Air Force, Appellant

15 USCMA 449, 35 CMR 421

No. 18,377

July 2, 1965

*Major Robert S. Amery* argued the cause for Appellant, Accused. With him on the brief was *Colonel Robert O. Rollman.*

*Lieutenant Colonel Robert M. Haynes* argued the cause for Appellee, United States. With him on the brief was *Colonel Emanuel Lewis.*

KILDAY, Judge:

Appellant was tried by special court-martial, convened in Taiwan, on six specifications of larceny, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921. Contrary to his plea, he was found guilty of all specifications. He was sentenced to a bad-conduct discharge, forfeitures for six months, and confinement at hard labor for six months. The convening authority and the officer exercising general court-martial jurisdiction approved the sentence. A board of review in the office of The Judge Advocate General of the Air Force modified the findings as to one specification and affirmed the sentence.

This Court granted review on two specified issues as follows:

"1. Whether there was probable cause to authorize the search of Barracks 132.

"2. Whether it was legal for the Commander of the Air Station to delegate the authority to authorize searches to his Executive Officer."

There had been a series of barracks larcenies at Shu Linkou Air Station, Taiwan, that had been going on over the six-month period prior to the trial. At first the thefts centered on Barracks S-234, then the thefts transferred to Barracks S-132. The appellant had lived in barracks 234 but he was transferred to barracks 132 with some other air policemen. After the transfer, the thefts stopped in barracks 234 and started in barracks 132.

On January 4, 1964, shortly after midnight, a barracks mate, Royster, met appellant at Linkou Club, downtown. Appellant was under the influence of alcohol and his barracks mate prevailed upon him to drink several cups of coffee. Appellant and his companion returned to the air station on the 1:15 a.m. bus. Appellant at one point asked his companion whether he could borrow some money and was told to talk to him after he was sober. Royster, upon reaching the barracks, proceeded to his bunk area, took off his clothes and placed his wallet, containing $20.00 United States

money and an amount of local currency, in the drawer of a bedstand beside his bed, went to bed and to sleep. Early that same morning, upon awakening, Royster found that the $20.00 United States money was missing from his wallet but the local currency had not been disturbed. Royster then went to the provost marshal's office and reported the loss.

On the night of the day preceding the above occurrence, Airman Gilkinson who was quartered in the same barracks with appellant, placed his watch on the bedstand beside his bed and went to sleep. The next morning a barracks mate complained that he was missing an amount of local currency. Thereupon Gilkinson checked and found that his watch was missing. Gilkinson was scheduled for an early tour that morning and upon returning that evening from the tour reported the loss of his watch to the air police.

January 4th was a Saturday and January 6th a Monday. Early on Monday, the Security and Law Enforcement Officer (Provost Marshal) had a conference with Major Keller, Executive Officer of appellant's unit, to whom the commanding officer had, in writing, delegated "authority to order periodical searches of vehicles, government and civilian, and any other searches that I am authorized to order, at his discretion." At that conference the executive officer was briefed by the provost marshal about the barracks larcenies of the weekend. There had been an established procedure under which the provost marshal briefed the executive officer as to serious incidents "the first thing in the morning any time it happens." Permission to search was not requested at that conference. However, that same afternoon the provost marshal telephoned the executive officer:

"Q: And at this time did you recall to him your previous conversations during the past months?

"A: I recalled to him these matters of the barracks thefts and I asked permission to search at that time with regard to these barracks thefts.

"Q: And as to items?

"A: Not specific items, no, sir.

"Q: As to the items that were taken over the week end [sic]?

"A: I didn't specifically mention these items.

. . . . .

"Q: How did you express it to him?

"A: I told him with regard to these barracks thefts, and especially the one over the weekend, I would like permission to search barracks 132."

The executive officer appeared as a witness and confirmed that the conference had been held with the provost marshal and that he granted permission to search barracks 132. He testified that over the past 30 or 45 days there had been a series of thefts as well as other infractions in the air police barracks. Some of the air policemen were moved into barracks 132. Thereupon, the thefts apparently ceased in the air police barracks and started immediately in barracks 132. On January 6th the provost marshal discussed with him other thefts and objects which had been stolen in "the last 24 hours."

The provost marshal, accompanied by three air police sergeants, began a search of barracks 132. Having searched the personal effects of three of the occupants of that barracks, they began a search of the effects of the appellant. Airman Royster, whose effects had already been searched, was present and observing the search of appellant's locker. Royster saw in appellant's locker what he believed to be a lens filter case and lens shade of his own camera. He immediately informed the provost marshal he believed the items were his. He also observed in appellant's locker an address book which belonged to him. Royster had missed his camera, lens filter case, and lens shade some months prior, but not knowing whether the same had been stolen, lost or mislaid, he had not reported the articles missing. Royster had lived in both barracks 234 and 132 with the appellant.

Upon the discovery of these items claimed by Royster, the search terminated. The provost marshal and his associates took the items mentioned and escorted appellant to the air police office. There, after warning under Article 31, appellant made a statement admitting the theft of the camera. That statement was reduced to writing and the appellant signed the same.

The following day, appellant was again interviewed by the air police investigators, was advised of his rights under Article 31, supra, and made another statement in writing in which he confessed to the commission of the offenses alleged in the specifications.

I

It appears to be logical that we first consider the second specified issue. That issue inquires whether it was legal for the lieutenant colonel commanding the air station to delegate the authority to authorize searches to his executive officer, a major.

Article 36(a), Uniform Code of Military Justice, 10 USC § 836, reads in part, as follows:

"The procedure, including modes of proof, in cases before courts-martial . . . may be prescribed by the President by regulations which shall, so far as he considers practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts, but which may not be contrary to or inconsistent with this chapter."

Article 140 of the Uniform Code of Military Justice, 10 USC § 940, reads as follows:

"The President may delegate any authority vested in him under this chapter, and provide for the subdelegation of any such authority."

The last subparagraph of paragraph 152, Manual for Courts-Martial, United States, 1951, reads as follows:

"A search of property which is owned or controlled by the United States and is under the control of an armed force, or of property which is located within a military installation or in a foreign country or in occupied territory and is owned, used, or

**451**

occupied by persons subject to military law or to the law of war, which search has been authorized by a commanding officer (including an officer in charge) having jurisdiction over the place where the property is situated or, if the property is in a foreign country or in occupied territory, over personnel subject to military law or to the law of war in the place where the property is situated. The commanding officer may delegate the general authority to order searches to persons of his command. This example of authorized searches is not intended to preclude the legality of searches made by military personnel in the areas outlined above when made in accordance with military custom."

The lieutenant colonel commanding the air station had delegated his authority to order searches by an instrument in writing, reading as follows:

"Pursuant to the authority vested [in] the Commanding Officer by Para 152, page 288 of the Manual for Courts Martial, U. S. 1951, regarding the search of property under his command, I hereby delegate to the Executive Officer, 6987th Security Group, authority to order periodical searches of vehicles, government and civilian, and any other searches that I am authorized to order, at his discretion."

During all of the time herein concerned, Major George R. Keller was the executive officer of the above-mentioned group.

We have previously held that Article 36 of the Code, supra, is a valid delegation to the President of the power by regulation to provide the procedure and modes of proof before courts-martial and that such regulations have the force of law. United States v Smith, 13 USCMA 105, 32 CMR 105.

In United States v Doyle, 1 USCMA 545, 547, 4 CMR 137, a case arising under the Articles for the Government of the Navy, prior to the effective date of the Uniform Code of Military Justice, supra, this Court said:

"There has long existed in the services a rule to the effect that a

military commanding officer has the power to search military property within his jurisdiction. . . . This rule and the reasons for it have been expressly recognized and approved by the Federal courts. United States v Best, 76 F Supp 857; Richardson v Zuppann, 81 F Supp 809. . . .

"Implied in the power of a commanding officer to order a search of military property is necessarily included the right to delegate this power."

Paragraph 152, Manual for Courts-Martial, supra, contains the express provision, "The commanding officer may delegate the general authority to order searches to persons of his command." United States v Weaver, 9 USCMA 13, 25 CMR 275.

Notwithstanding Articles 36 and 140, Uniform Code of Military Justice, supra, and paragraph 152, Manual for Courts-Martial, supra, it is contended that there can be no lawful delegation of the authority to order a search and seizure; that the power to authorize such acts is purely judicial and must, therefore, be personally exercised by the commander. United States v Allen, 5 USCMA 626, 18 CMR 250, is cited in support of the contention.

We find nothing in United States v Allen, supra, to sustain the present contention. Indeed, we feel that the case constitutes persuasive authority to the contrary. Allen involved the composition of a court-martial. It there appeared that one-half of the individuals named in the order convening the court were excused from attendance by action of the staff judge advocate, his executive officer, or some official other than the convening authority. It appears the situation grew out of a practice for the convening authority to include in his order convening a general court-martial a large number of officers with the understanding that only a much smaller number would actually be called to serve in an individual case, thus rotating the court-martial duty and burden to a larger number of officers of the command. We point out that Article 22 of the Code, 10 USC § 822, provides who may convene general courts-

martial. There is no provision of the Manual affecting the subject. Reserving opinion as to whether the convening of a court is fundamental and substantive, rather than procedural, we point out that Article 22 is detailed and specific in its terms and any deviation therefrom would be contrary to and inconsistent with the Code. On the other hand the Code is entirely silent on the question of searches and seizures and the Manual is quite specific on that subject, including the designation of the commanding officer as the person authorized to order searches and the equally specific authority that the commanding officer may delegate this authority. This is clearly a procedural matter committed to the President by Article 36 of the Code, supra.

In United States v Ness, 13 USCMA 18, 32 CMR 18, we had before us a case in which the commanding officer had delegated to the air base provost marshal general authority to order searches and seizures. A majority of the Court found it unnecessary to explore the issue because of the particular facts of that case. They did, however, issue a caveat, in a footnote, that there may be a substantial question as to the propriety of a blanket delegation of authority to order searches to a police officer such as the provost marshal. That caveat was based upon Johnson v United States, 333 US 10, 92 L ed 436, 68 S Ct 367 (1948). In the latter case, the Supreme Court laid stress upon the fact that the fundamental idea behind the requirement that there be authorization to search separate from that of the police officer is that the official to whom the request is made brings "judicial" rather than a "police" attitude to the examination of the operative facts. The effect of the language of the footnote is to constitute a caveat that the commanding officer's power of delegation is not an absolute and unreasoning one, but is to be exercised reasonably and impartially.[1]

In United States v Hartsook, 15 USCMA 291, 35 CMR 263, we held that in the exercise of his power to authorize a search, a commanding officer stands in the same position as a Federal magistrate issuing a search warrant. See also United States v Davenport, 14 USCMA 152, 33 CMR 364. There is nothing in either of those opinions which could in anywise be construed as an expression of opinion that the power granted, in paragraph 152, Manual, supra, to the commanding officer to delegate his power to authorize searches, does not exist or that such delegation is unlawful.

The Fourth Amendment to the Constitution provides, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." It is silent as to who may issue such warrants and make the determination as to the existence of probable cause or the reasonableness of the search. Neither does it contain any provision as to the person or official before whom such oath or affirmation shall be made. These necessary ingredients have been provided by statute, judicial pronouncements, or rules of court. Currently, in the Federal civilian system, such matters have been committed, by the Congress, to the Supreme Court with power to formulate rules on the subject. Act of June 29, 1940, 54 Stat 688, Title 18, United States Code, Section 3771. Under that delegation, the Supreme Court has formulated Rule 41, Federal Rules of Criminal Procedure. By that rule the Supreme Court has seen fit to provide that a search warrant "may be issued by a judge of the United States or of a state, commonwealth or territorial court of record or by a United

[1] A short time after our decision in United States v Ness, 13 USCMA 18, 32 CMR 18, the Air Force issued instructions implementing that decision and directing that the power to authorize searches and seizures should never be delegated to individuals primarily engaged in criminal investigations or police work. The instructions also provide that delegation should be limited to those persons whose rank, experience, duties and responsibilities, and temperament are such as to insure a dispassionate and impartial "judicial" determination. We believe that the Air Force instruction properly evaluates the effect of our decision in United States v Ness, supra.

States Commissioner within the district wherein the property sought is located."

We have heretofore commented:

"We also believe that paragraph 140a, Manual for Courts-Martial, supra, is an exercise of the power delegated to the President by Article 36 of the Code, similar to, or identical with the Rules of Criminal Procedure for the United States District Courts, adopted by the Supreme Court under the legislative authority above granted. . . ." [United States v Smith, supra, 13 USCMA, at page 119.]

Rule 41 utilizes existing judges, commissioners (or magistrates). There is no exact counterpart of such officials within the military system. By paragraph 152, the President has placed the power of authorization of searches in the commanding officer, or such person as he may delegate for that purpose. Under the paragraph such power becomes an incident of command with power of delegation. Of course, the President knew that in the event of absence of, or casualty to, a commanding officer his command would descend to others in well-established sequence. Therefore it is clear that, apart from such succession, the Presidential intention was to provide an alternate officer to exercise this detail of command.

In the case before us, we find it impossible to perceive in what manner the delegation by a lieutenant colonel commander of this power to his executive officer, a major, could be construed as being contrary to any provision of law applicable within the military. The power to authorize searches is indeed a "judicial function." However, within the military it is not exercised, nor could it be, by a strictly "judicial officer"; it is an incident of command. There is nothing in this case to indicate that the executive officer was less capable of exercising a "judicial" rather than a "police" attitude to the examination of the operative facts.

We therefore conclude that it was legal for the commander of the air station to delegate the authority to authorize searches to his executive officer.

**454**

## II

We now turn to the consideration of the first issue specified by this Court. The issue inquires: "Whether there was probable cause to authorize the search of Barracks 132."

First, it is to be noted that the authority granted was to search barracks 132, rather than any person or the personal effects of any individual.

Very importantly, we observe that we are not here concerned with the reasonableness of a police officer's action in conducting a search on his own volition. In this instance, we have before us the military counterpart of the case in which the police officer submits to a civilian magistrate the evidence from which that official is to determine the existence of probable cause. This latter state of case has very recently received the attention of the Supreme Court in United States v Ventresca, 380 US 102, 13 L ed 2d 684, 687, 85 S Ct 741 (1965). The reason, stated in the opinion, for granting certiorari is important, because it reveals that the Supreme Court was laying down guidelines for reviewing courts. Mr. Justice Goldberg stated:

". . . We granted certiorari to consider the standards by which a reviewing court should approach the interpretation of affidavits supporting warrants which have been duly issued by examining magistrates."

Continuing, the Supreme Court said:

". . . We begin our analysis of this constitutional rule mindful of the fact that in this case a search was made pursuant to a search warrant. In discussing the Fourth Amendment policy against unnecessary invasions of privacy, we stated in Aguilar v Texas, 378 US 108, 12 L ed 2d 723, 84 S Ct 1509:

'An evaluation of the constitutionality of a search warrant should begin with the rule that "the informed and deliberate determinations of magistrates empowered to issue warrants . . . are to be preferred over the hurried action of officers . . . who may happen to make arrests." United

States v Lefkowitz, 285 US 452, 464, (76 L ed 877, 882, 52 S Ct 420, 82 ALR 775). The reasons for this rule go to the foundations of the Fourth Amendment.' 378 US, at 110–111, 12 L ed 2d at 726.

"In Jones v United States, 362 US 257, 270, 4 L ed 2d 697, 707, 80 S Ct 725, 78 ALR2d 233, this Court, strongly supporting the preference to be accorded searches under a warrant, indicated that in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall."

In Aguilar v Texas, 378 US 108, 12 L ed 2d 723, 84 S Ct 1509, the Supreme Court had also said:

". . . Thus, when a search is based upon a magistrate's, rather than a police officer's, determination of probable cause, the reviewing courts will accept evidence of a less 'judicially competent or persuasive character than would have justified an officer in acting on his own without a warrant,' ibid., and will sustain the judicial determination so long as 'there was substantial basis for (the magistrate) to conclude that the narcotics were probably present. . . .' Id., at 271, 4 L ed 2d at 708." [The quotations within the above quotation are from Jones v United States, 362 US 257, 4 L ed 2d 697, 80 S Ct 725.]

Reviewing the evidence in this case in the light of the recent cases in the Supreme Court, previous decisions of this Court and other Federal courts, we are convinced that the record reflects that there was probable cause to search the barracks.

Without unnecessary repetition, we observe that over a period of some forty-five days there had been a series of larcenies in the military police barracks. As to each of these larcenies, the executive officer who ultimately granted authority to search was briefed in detail as to each offense and was kept currently informed with reference thereto. Several of the men in the military police barracks were transferred to barracks 132. Immediately larcenies in the military police barracks ceased but larcenies began in barracks 132, the details of all of which were made known to the executive officer. On Saturday morning apparently three larcenies committed during the previous night were discovered and at least two were properly reported. On Monday, the first duty day thereafter, the executive officer was briefed as to the details thereof. Later the same day the attention of the executive officer was again called to the series of larcenies during a period of forty-five days, with specific reference being made to the larcenies over the weekend. He was asked to and did authorize search of the barracks. No matter whom the provost marshal may have suspected as the guilty party, there is no basis in this record for fastening suspicion on any one of those suspected over a number of other individuals. One of the larcenies of the weekend was of a watch, one of a specified amount of United States currency, and one of a specified amount of local currency. It was entirely reasonable to search the barracks for the articles so recently the object of larceny. Brinegar v United States, 333 US 160, 93 L ed 1879, 69 S Ct 1302 (1949); United States v Summers, 13 USCMA 573, 33 CMR 105; United States v Schafer, 13 USCMA 83, 32 CMR 83, and cases therein cited.

It should not be necessary to point out the major and very evident distinctions between this case and the cases of United States v Hartsook, 15 USCMA 291, 35 CMR 263, and United States v Davenport, 14 USCMA 152, 33 CMR 364. In this case the officer authorizing the search was kept currently informed of the details of each larceny and especially the one which shortly preceded the authority to search, while in those cases the officer authorizing the search had no such detailed information.

The search here authorized was for the fruits of a crime and not for merely evidence thereof. The official authorizing the search was fully aware of the items sought by the searchers. The search authorized was of the barracks and not the effects of any one man. The information possessed by the exec-

455

utive officer was sufficient to serve as a basis upon which he could distinguish between matters of evidence and the fruits of crime; and the basis for inferring and believing that the fruits of crime might be in the barracks. Upon the basis thus available to him he could determine the existence of probable cause, which issue he determined by authorizing the search of the barracks. United States v Ventresca, supra.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (dissenting):

I dissent.

With the disposition of this appeal, our resolution of search and seizure questions makes a radical departure from the central feature of the Fourth Amendment and, by approving delegation of magisterial powers to pass upon the existence of probable cause, renders its shield almost nugatory. I am unable to agree that creation of judicial authority is in anywise a procedural matter, or that the authority of a military commander to judge whether a search of one's personal effects should be made is dependent upon the provisions of the Manual for Courts-Martial, United States, 1951, or Uniform Code of Military Justice, Article 36, 10 USC § 836. To the contrary, it exists independently of such authorities as a substantive attribute of command, which, because of its nature, must be personally exercised.

Hence, Major Keller could not, as the designee of the Commander, Shu Linkou Air Station, judicially pass on the issue of probable cause and, of necessity, the search which he purported to authorize was without foundation in law. Finding such to be the case, I need not express my views on the sufficiency of the evidence presented to him, and limit them to an exposition of the error into which I am constrained to believe my brothers fall regarding delegation of authority.

I

*The Judicial Nature of Determining Existence of Probable Cause*

The problem of illegal search and

seizure was by no means an abstract matter to our Founding Fathers. They were Englishmen to the core. As sons of Albion, they knew only too well the sacred obligation of the royal power, undertaken in Magna Carta, to take no freeman, nor to "pass upon him, nor condemn him, but by lawful Judgment of his Peers, or by the Law of the Land." Magna Carta, CAP. XXIX, Am Jur 2d Desk Book, Document No. 4, page 47. They, as men of the common law, knew also that this compact with the King formed the basis in England of the historic decisions that the Executive could not authorize searches and seizures. Huckle v Money, 2 Wils KB 205, 95 Eng Rep R 768 (1763); Entick v Carrington, 2 Wils KB 275, 95 Eng Rep R 807 (1765); Money v Leach, 3 Burr 1742, 97 Eng Rep R 1075 (1765); Wilkes v Wood, Lofft 1, 98 Eng Rep R 489.

In those cases, warrants had been issued by the Secretary of State to his petty officers authorizing them to make diligent searches for the unnamed authors, printers, and publishers of allegedly treasonable pamphlets and to seize them together with all their papers. In striking down the authority to issue such odious writs, the King's Bench described requirements which, two decades later, found their way into our Fourth Amendment. Thus, Chief Justice Mansfield proclaimed, in Money v Leach, supra, at page 1088:

"It is not fit, that the receiving or judging of the information should be left to the discretion of the officer. The magistrate ought to judge; and should give certain directions to the officer. This is so, upon reason and convenience.

"Then as to authorities—Hale and all others hold such an uncertain warrant void: . . ."

And in Entick v Carrington, supra, at page 818, Chief Justice Pratt declared:

". . . This case was compared to that of stolen goods; Lord Coke denied the lawfulness of granting warrants to search for stolen goods, 4 Inst. 176, 177, though now it prevails to be law; but in that case the justice and the informer must pro-

ceed with great caution; there must be an oath that the party has had his goods stolen, and his [sic] strong reason to believe they are concealed in such a place; but if the goods are not found there, he is a trespasser; . . ."

Elsewhere, Pratt exclaimed, "To enter a man's house by virtue of a nameless warrant, in order to procure evidence, is . . . a law under which no Englishman would wish to live an hour; . . . a most daring public attack made upon the liberty of the subject." Huckle v Money, supra, at page 769. These sentiments were echoed by the Colonists when Royal governors sought to use the infamous Writs of Assistance as authority for general searches. In Paxton's Case, 1 Quincy (Mass) 51 (1761), James Otis argued:

". . . This writ is against the fundamental principle of law. . . . A man, who is quiet, is as secure in his house, as a Prince in his Castle—notwithstanding all his debts and civil processes of any kind. But for flagrant crimes, and in cases of great public necessity, the Privilege may be incrohd [sic] upon. For felonies an officer may break, upon process, and oath—i.e. by a Special Warrant to search such a house, sworn to be suspected, and good grounds of suspicion appearing. . . ." [Quincy, Reports of Cases Argued and Adjudged in the Superior Court of Judicature of the Province of Massachusetts Bay Between 1761 and 1762.]

Of Otis' argument, John Adams wrote, "Here this day, in the old Council Chamber, the child Independence was born." Bowen, John Adams and the American Revolution, page 217 (1950). Following the American Revolutionary War, Otis' words, based as they were upon the sturdy precedents of common law cited above, were enshrined in our Constitution's Fourth Amendment:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

That none may doubt the historical and continuing accuracy of the Amendment's requirement for a judicial scrutiny of the issue of probable cause to authorize a search, I refer to the following language in Weeks v United States, 232 US 383, 58 L ed 652, 34 S Ct 341 (1914), at page 389:

". . . [I]t took its origin in the determination of the framers of the Amendments to the Federal Constitution to provide for that instrument a Bill of Rights, securing to the American people, among other things, those safeguards which had grown up in England to protect the people from unreasonable searches and seizures, such as were permitted under the general warrants issued under authority of the government, by which there had been invasions of the home and privacy of the citizens, and the seizure of their private papers in support of charges, real or imaginary, made against them. . . . Resistance to these practices had established the principle which was enacted into the fundamental law in the 4th Amendment, that a man's house was his castle, and not to be invaded by any general authority to search and seize his goods and papers.

• • • • •

"*The effect of the 4th Amendment is to put the courts of the United States and Federal officials, in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority, and to forever secure the people, their persons, houses, papers, and effects, against all unreasonable searches and seizures under the guise of law.*" [Emphasis supplied.]

In Johnson v United States, 333 US 10, 92 L ed 436, 68 S Ct 367 (1948), at page 13, Mr. Justice Jackson remarked:

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies

law enforcement the support of the usual inferences which reasonable men draw from evidence. *Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."* [Emphasis supplied.]

And in McDonald v United States, 335 US 451, 93 L ed 153, 69 S Ct 191 (1948), the Supreme Court declared, at page 455:

". . . [P]rivacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing; and history shows that the police acting on their own cannot be trusted. *And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home."* [Emphasis supplied]

These authorities establish beyond cavil the judicial nature of authorizing searches and seizures upon probable cause in an unbroken line of precedents dating back to early colonial days. See Aguilar v Texas, 378 US 108, 12 L ed 2d 723, 84 S Ct 1509 (1964). Indeed, the power must not only be exercised by a magistrate, but he must judicially "perform his 'neutral and detached' function and not serve merely as a rubber stamp for the police." *Aguilar,* supra, at page 111.

It is wrong, therefore, to conclude that the Executive plays any role in authorizing searches and seizures or in passing on the issue of their necessity. This is, and has always been, a function of the judiciary. Its importance has become accentuated in the late years with the adoption of the position that receipt of evidence obtained in violation of the Fourth Amendment is directly barred by the Constitution rather than being a mere rule of evidence. Compare Mapp v Ohio, 367 US 643, 6 L ed 2d 1081, 81 S Ct 1684 (1961), with Wolf v Colorado, 338 US 25, 93 L ed 1782, 69 S Ct 1359 (1949). No matter how developed the law may have become in

this area, though, the courts have steadfastly adhered to the necessity for a judge unconnected with the investigatory process to scrutinize the evidence and determine whether the invasion of the accused's privacy is justified. I am compelled, therefore, to find the Constitution requires us so to characterize preliminary actions on searches.

## II

### *The Military Magistrate*

Questions concerning submission of questions of probable cause to non-judicial officers seem, by their very nature, not to have arisen in civilian jurisdictions. The authorities cited, supra, as having dealt with the immutable requirement of the judicial officer passing on the issue, involved either failure to seek a warrant; no evidence to support a finding of probable cause; or similar violations of the Amendment. Always, however, there was in existence a magistrate, either unconsulted or, if consulted, who abused his discretion.

In the armed services, a quite different problem exists. It is immediately obvious that access to existent Federal or state magistrates has never been easy or practicable, particularly on isolated military installations in this country and, of course, in overseas areas, where no American civilian judge has operative authority. In consequence, commanding officers of units and installations long ago were recognized as possessing the judicial authority to authorize searches and seizures involving personnel and areas under their command. 1 Compilation of Court-Martial Orders, Navy Department, 1916–1937, page 816; *Ibid.,* Volume 2, page 1349; Opinion of The Judge Advocate General, U. S. Army, JAG 250.413, July 23, 1930; Digest of Opinions of The Judge Advocate General of the Army, 1912–40, section 395 (27); United States v Lichtenberger, 4 BR 81, 135; United States v Berry, 9 BR 155, 157; United States v Wilson, 31 BR 231; United States v Owens, 54 BR 309; United States v Richardson, 77 BR 1; United States v Tooze, 3 BR–JC 313, 345; United States v Arteaga, 1

458

CMR 632. His authority in nowise depends upon Presidential regulations prescribed under Code, supra, Article 36.

Thus, in United States v Pogue, 68 BR 385, at page 393, it was declared:

"A search of Government quarters, authorized by the commanding officer having jurisdiction over the locality where such quarters are situated, is legal. Such authorization is the equivalent of a search warrant, the commanding officer being responsible for and having control over the personnel and property in his charge."

And, in United States v Worley, 3 CMR (AF) 424, 442, it was recognized that:

". . . On the other hand, the Commanding Officer with respect to property under his control has plenary power. He is fully and directly responsible to his Government for all action necessary to perform his duties. He has the power of investigation to determine whether a search should be made and to execute a search or direct its execution. In other words, he has the power of . . . the magistrate. . . ."

This Court has long recognized this magisterial attribute of the commander's office. United States v Swanson, 3 USCMA 671, 14 CMR 89; United States v DeLeo, 5 USCMA 148, 17 CMR 148; United States v Higgins, 6 USCMA 308, 20 CMR 24. In United States v Brown, 10 USCMA 482, 28 CMR 48, we pointed out the authority must be exercised upon a determination by the commander of the existence of probable cause to search an accused's effects. And in United States v Davenport, 14 USCMA 152, 33 CMR 364, we said such a finding must be based upon information actually communicated to the commander. Finally, in United States v Hartsook, 15 USCMA 291, 35 CMR 263, we summarized our position. There, Judge Kilday, speaking for the Court, declared, at page 294:

". . . Power to authorize a search is within the province of the commanding officer, including an officer in charge. Paragraph 152, Manual for Courts-Martial, United States, 1951. In this context *he stands in the same relation vis-a-vis the investigating officer and an accused as the Federal magistrate. And we have so equated him.* United States v Ness, 13 USCMA 18, 32 CMR 18; United States v Battista, 14 USCMA 70, 33 CMR 282; United States v Davenport, 14 USCMA 152, 33 CMR 364.

. . . . . . .

"As we have indicated, in military law *the 'independent judicial officer' is the commanding officer to whom application for authority to search is made* and it is his decision and not that of the investigating officers which governs 'whether . . . privacy is to be invaded.' *He personally weighs the evidence and determines the existence of probable cause.*" [Emphasis supplied.]

The other Federal courts have likewise recognized the role of the military commander as a magistrate. In Richardson v Zuppann, 81 F Supp 809 (MD Pa) (1949), affirmed, 174 F2d 829 (CA 3d Cir) (1949), it was declared:

"'. . . [A] search and seizure deemed necessary by the highest military commanders, ordered by them to be conducted in the manner customarily employed by the military, with their orders relayed down the chain of military command, and executed in an orderly manner by military personnel, cannot be termed unreasonable.'"

See also Best v United States, 184 F2d 131 (CA 1st Cir) (1950), cert den, 340 US 939, 95 L ed 677, 71 S Ct 480 (1951), wherein the court remarked, at page 140, of the search of accused's apartment upon the commanding officer's authority, that such was "clearly within the constitutional sanction."

It is undeniable, therefore, that the exigencies of military life—necessity, if you will—have clothed the commanding officer with the judicial role of the ordinary Federal magistrate in connection with authorizing searches

and seizures. Perhaps the office also finds its basis in legislative responsibility conferred upon commanders, as for example, in 10 USC § 5947. Be that as it may, it is certain that the authority is judicial; that in passing on questions of probable cause, the commander is a judge, and, as we have noted, he "personally weighs the evidence." United States v Hartsook, supra. It exists independently of the Manual, supra, which merely sets forth a search which he authorizes as an example of "those which are lawful." Manual, supra, paragraph 152.

### III

#### Delegation of The Magisterial Function

As the question of determining the existence of probable cause is clearly judicial and as the commander, in making that finding, is a judge, may his duty be delegated to another person, officer or enlisted, who does not possess responsibility for the persons and property under the commander's control and whose discretion and rank has not led him to be vested with the commander's powers? That is the nub of the inquiry presented here, and it cannot be denied that the President has purported expressly to authorize such delegation.

Thus, the Manual, supra, provides, in paragraph 152:

". . . The commanding officer may delegate the general authority to order searches to persons of his command."

. The Presidential authority to prescribe principles of law, however, was expressly limited by Congress to the power to lay down regulations governing the "procedure, including modes of proof, in cases before courts-martial, courts of inquiry, military commissions, and other military tribunals." Code, supra, Article 36, 10 USC § 836. He has no authority to set down matters of substantive law, for such is confided by the Constitution solely to the National Legislature. And that body has not seen fit to permit the Executive to go beyond

the area of procedural and evidentiary matters. That is the entire point of the lengthy discussion, and collation of authorities in United States v Smith, 13 USCMA 105, 119, 32 CMR 105. As we there concluded of the Manual, supra:

". . . [I]t is wholly understandable—perhaps even desirable—that the Manual, as a handy compendium on military justice, include statements concerning substantive principles of law. *The fact that it does so, however, neither adds nor detracts from the validity of the rule set forth, as Congress did not delegate to the President the authority to fix substantive rules.*" [Emphasis supplied.]

The question of conferring the authority to authorize searches upon another member of the command is clearly a substantive matter, for it vests in that individual a judicial office, the creation of which is solely a matter of legislative regulation. True, the distinction between matters of procedure and substance is not always clear, but the "test must be whether a rule really regulates procedure,—the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them." Sibbach v Wilson & Co., 312 US 1, 14, 85 L ed 479, 485, 61 S Ct 422, 426 (1941). See also Hanna v Plumer, 380 US 460, 14 L ed 2d 8, 85 S Ct 1136 (1965). And the conferring of an important responsibility to exercise judicial discretion upon an unnamed and unknown individual, so long as he is within the command, is the creation of a new office rather than a regulation of the judicial process. Moreover, it should be noted that there is no limitation on this purported authority, which permits delegation to any person, regardless of his status and capacities. And, if the President has the authority so to prescribe, then we will have no judicial power to question the reasonableness of its exercise. The matter is set down without limitation. Hence, it seems to me that this matter is quite without the

460

purview of Presidential power. Code, supra, Article 36; United States v Smith, supra.

Moreover, delegation of such judicial authority, the magisterial character of which has been clearly demonstrated, has long been prohibited. Thus, it "has often been held that a judge may not delegate his judicial authority or the performance of judicial acts, even with the consent of parties . . . there can be no such thing as a deputy judge." 30A Am Jur, Judges, § 29. Or, as stated in Morrow v Corbin, 122 Tex 553, 62 SW 2d 641 (1933), at page 645:

> "We are equally clear that the power thus confided to our trial courts must be exercised by them as a matter of nondelegable duty, that they can neither with nor without the consent of parties litigant delegate the decision of any question within their jurisdiction, once that jurisdiction has been lawfully invoked, to another agency or tribunal, and that any legislative act attempting to authorize such a delegation of authority is inconsistent with those provisions of the Constitution which confer jurisdiction on the trial tribunals."

See also Ex parte Alabama State Bar Ass'n., 92 Ala 113, 8 So 768 (1891) ("Special Judge" named to hear disbarment proceeding), and Ellerbe v State, 75 Miss 522, 22 So 950 (1898) (Judge improperly designated member of bar to preside in murder trial while he visited sick friend).

How then do my brothers find the President may properly provide in the Manual, supra, for the commanding officer, without any guidelines, to name any member of his command, as competent to pass on the existence of probable cause? First, they conclude: "This is clearly a procedural matter committed to the President." From that springboard, they launch into a comparison of the Manual provision with Rule 41, Federal Rules of Criminal Procedure, and find that, as that Rule designates officers who may issue search warrants, so may the President, under his express authority to redelegate his powers, provide for the commander to name a subordinate and clothe him with judicial authority. Finally, they declare, not that a commander is a magistrate in dealing with search and seizure questions, but only that he must approach them with a "judicial" attitude.

For the reasons set out above, I suggest the initial premise of my brothers' view, i.e., that this is a procedural matter, is incorrect. As I have noted, the net effect here is not to prescribe a rule of practice, but to provide for the creation of judicial offices. Cf. Sibbach v Wilson & Co., supra. Secondly, Rule 41, rather than supporting this approach, really refutes it, for it appoints no new judges, nor does it create magistracies. Instead, it makes it permissible for *already existing judicial officers* to issue Federal search warrants. Clearly, this is a matter of procedure, but how unlike the Manual provision it is!! Finally, the entire history of the Fourth Amendment and the cases dating back in an unswerving line to our English antecedents mark out the judicial character of passing on questions of probable cause. So also do our own holdings, which refer to the commander as the counterpart of "the Federal magistrate," who "personally weighs the evidence and determines the existence of probable cause." United States v Hartsook, supra, at page 295. Such is a far cry from a conclusion that he merely must look at the evidence judiciously.

In conclusion, I can only state I am convinced by precedent and constitutional history that it was the intent of the framers forever to guard against ruthless use of Executive power by confiding the question of determining probable cause for searches and seizures to the judiciary. It may be the Amendment does not expressly state this proposition, but its use of the term "warrant," clearly connotes resort only to the judicial process. It must be read, as the Supreme Court has said, in light of the English precedents cited. Boyd v United States, 116 US 616, 29 L ed 746, 6 S Ct 524 (1886). Thus construed, it requires

judicial action to issue a warrant. In the military, this has long been the function of the Commander. I cannot join in permitting the executive to authorize him to rid himself of this important duty by conferring it on someone else. So to act, I think, is a matter of substantive law which, at the least, requires Congress' action, particularly in light of the basic prohibition against delegation of magisterial responsibilities. Accordingly, I note my dissent to the proposition which they advance.

I would reverse the board of review and order a rehearing.