**UNITED STATES**

**v.**

**Specialist Four Leroy J. FONTENETTE, 434–92–6135, U. S. Army, Headquarters and Headquarters Battery, Headquarters Command, U. S. Army Air Defense Center and Fort Bliss, Fort Bliss, Texas.**

**SPCM 12044.**

U. S. Army Court of Military Review.

28 March 1977.

Appellate Counsel for the Accused: CPT Michael P. LaHaye, JAGC; CPT Lawrence E. Wzorek, JAGC; LTC John R. Thornock, JAGC; COL Alton H. Harvey, JAGC.

Appellate Counsel for the United States: CPT Gary F. Thorne, JAGC; COL Thomas H. Davis, JAGC.

Before JONES, FULTON and FELDER, JJ.

OPINION OF THE COURT

FULTON, Judge:

The appellant pled not guilty, but was convicted by a special court-martial of possessing and selling marihuana in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934. The court members sentenced him to a bad-conduct discharge, confinement for one month, forfeiture of $235.00 for one month, and reduction to Private E–1. The convening authority approved only the conviction for possession, approved the full sentence, but suspended the discharge for nine months. The confinement has been served, the forfeiture applied, and the punitive discharge presumably remitted by expiry of the suspension.

On mandatory review pursuant to Article 66, UCMJ, 10 U.S.C. § 866, the issue is

whether the appellant's confession was the product of an illegal search and seizure and was, therefore, improperly admitted in evidence. Other assigned errors are more clearly without merit and will not be discussed.

The appellant's statement was made to Army Criminal investigators on the day following a "health and welfare inspection" of the barracks in which he resided. Suspicion had focused upon him because of the appearance of some cigarette butts found during the inspection inside the removable base of an ash stand in his room. The statement contained nothing concerning those butts, but he admitted to possessing and selling a kilogram of marihuana three days before the inspection.

The inspection occurred because marihuana had been found in the common latrine areas of the barracks. At about 0800 hours, the barracks sergeant performing his routine duties discovered what appeared to be marihuana concealed in a floor drain in one of the latrines. Reporting this to the battery commander, the sergeant was instructed to search all three common latrines in detail. He found marihuana concealed above ceiling panels in two of them. (The first floor latrine yielded a shoe box with 20 packets of marihuana and a sack with 30 packets. One of the two second floor latrines yielded a sack with 16 packets.) Military police were summoned and, when they opined that the marihuana amounted to two kilograms with a street value of $750.00, an apparently shaken battery commander directed a "health and welfare inspection" of the entire barracks.[1] The inspection was carried out by teams of the battery officers and noncommissioned officers. With the barracks sergeant unlocking the doors, they were to inspect every room, including administrative offices, the day

room, common areas, and a stairwell leading down to the supply room. They were told to look for such things as drugs, ammunition, liquor, flammables, Government property improperly present (such as items from the mess hall), food, and valuables left unsecured. Apparently most occupants were absent from the barracks at their various work sites; accordingly, their locked containers, such as wall lockers, were not inspected.

The battery commander testified that it was the quantity of marihuana found in the latrines that moved him to have the inspection. He said—

> I felt that there was liable to be more marihuana in the barracks, but I was not engaged in any kind of a, a witch hunt to try to prosecute somebody. I was only interested in getting that amount of marihuana, if there was more, out of the barracks.

On cross-examination, he said that he knew that possession of marihuana was a crime and he responded affirmatively to the following question:

> And if you were to conduct a health and welfare inspection and you found a bunch of marihuana in somebody's room exactly as you did in this case you would refer it to the prosecuting authorities and consider that a crime had been committed and that that was proper for police authorities. Is that not correct?

As previously mentioned, suspicion focused on the appellant because of the appearance of cigarette butts found when the base of an ash stand in his individual room was removed. Also, a hemostat with possible marihuana residue on it was found behind a picture on the wall. On the day following the inspection, the appellant and one or two other occupants in whose rooms evidence had been found were interrogated

---

1. The record indicates that such inspections recently had been conducted at monthly intervals. The battery commander would arrange in advance for the use of a marihuana detection dog, telling his officers and principal noncommissioned officers only the night before the inspection. The inspections normally were held at about 0430 hours when most occupants

were present. The inspection scheduled for the preceding month had been cancelled when the commander discovered that the element of surprise was lost. A dog was not used in the inspection now under consideration. Neither did the military policemen, although still present, actively participate.

by criminal investigators. Apparently the appellant was questioned first. After proper advice as to his rights against self-incrimination and to counsel, the appellant waived those rights. He admitted that, four days earlier, he had purchased a kilogram of marihuana from one soldier at the latter's residence and sold it to one Private Mandell at the barracks.[2] The appellant was charged with the possession and sale of that kilogram. An additional charge of possessing 19 marihuana cigarette butts was preferred, but was dismissed on motion when the prosecution presented no evidence.

 What the battery commander termed a health and welfare inspection was, in contradistinction, a search. *See United States v. Lange,* 15 U.S.C.M.A. 486, 35 C.M.R. 458 (1965). There was an intrusion into areas in which a soldier has been regarded as having a reasonable expectation of privacy. *See United States v. Thomas,* 24 U.S.C.M.A. 228, 231, 51 C.M.R. 607, 610, 1 M.J. 397, 400–401 (1976); *United States v. Miller,* 50 C.M.R. 303 (A.C.M.R.1975), *aff'd,* 24 U.S.C.M.A. 192, 51 C.M.R. 437, 1 M.J. 367 (1976). The inspection was occasioned by the suspicion of criminal conduct. *Compare United States v. Lange, supra, with United States v. Grace,* 19 U.S.C.M.A. 409, 42 C.M.R. 11 (1970), *and United States v. Ramirez,* 50 C.M.R. 68 (N.C.M.R.1974). There was no operational purpose, such as ascertaining the status or serviceability of military equipment or clothing. *Compare United States v. Goldfinch,* 41 C.M.R. 500 (A.C.M.R.1969), *with United States v. Tates,* 50 C.M.R. 504 (A.C.M.R.1975), *and United States v. Smith,* 48 C.M.R. 155 (A.C.M.R.1973). Although the primary purpose may have been to rid the unit of marihuana, the necessary result was to uncover the fruits or evidence of criminal conduct.

The search was authorized by a proper official. The battery commander's office was in the barracks. He was in charge of the barracks and the commander of substantially all of its occupants including the appellant. (The rooms of a few members of another unit were entered by an officer and noncommissioned officer from that unit.)

The record does not indicate that any suspicion had focused on the appellant before the search, much less that there was probable cause to warrant a search of his room alone. Accordingly, the question is whether there can be, and was, probable cause for a search of all living quarters within the barracks.

It has been held that the discovery of a body, other evidence, and a trail of blood leading towards a barracks area made reasonable the search of a block of 20 barracks and 5 other buildings. *United States v. Schafer,* 13 U.S.C.M.A. 83, 86–87, 32 C.M.R. 83, 86–87 (1962). A particular pattern of thefts gave probable cause for the search of a barracks in *United States v. Drew,* 15 U.S.C.M.A. 449, 454–455, 35 C.M.R. 421, 426–427 (1965). The odor of burned marihuana in a barracks has been held to afford probable cause for searching each room therein. *United States v. Owens,* 48 C.M.R. 636 (A.F.C.M.R.1974), *aff'd* 23 U.S.C.M.A. 700, 50 C.M.R. 906 (1975) (equally divided court). *See also United States v. Harman,* 12 U.S.C.M.A. 180, 30 C.M.R. 180 (1961); *United States v. Gebhart,* 10 U.S.C.M.A. 606, 28 C.M.R. 172 (1959).

Clearly, under this line of cases, the discovery of a large quantity of marijuana in the latrine areas used in common by occupants of the barracks made reasonable the search of the assigned living areas of those occupants.

Subsequent to the filing of the appellant's brief, the Court of Military Appeals decided *United States v. Roberts,* 25 U.S.C.M.A. 39, 54 C.M.R. 39, 2 M.J. 31 (1976). Government counsel view the actions of the battery commander in this case as within the definition of "shakedown inspection" in *Roberts,* namely—

> A thorough search of a general area, such as a barracks . . . (as opposed to a

---

2. Private Mandell's trial testimony confirmed this and revealed that the kilogram was among the marihuana found in the latrines before the inspection.

particular living area or room) [and] of all persons and things in that area (as opposed to a particular, suspected person) for specific fruits or evidence of a crime, based upon "probable cause" to believe that such material will be found somewhere in that general area.

25 U.S.C.M.A. at 45, 54 C.M.R. at 45, 2 M.J. at 35. Judge Perry observed that he was "unable to discern the constitutional basis for such a fishing expedition, nor is one apparent in this Court's precedents which seem merely to accept such a procedure as one 'which has long been recognized.'" *Id.* He concluded that such an inspection, "in search specifically of criminal goods or evidence is not . . . a permissible intrusion into a person's reasonable expectation of privacy, even in the military setting." 25 U.S.C.M.A. at 48, 54 C.M.R. at 48, 2 M.J. at 36. Chief Judge Fletcher concurred in the result (reversal of *United States v. Roberts,* 50 C.M.R. 699 (A.F.C.M.R.1975), and dismissal of charges) because of the views he had expressed earlier in *United States v. Thomas,* 24 U.S.C.M.A. 228, 233–36, 51 C.M.R. 607, 612–25, 1 M.J. 397, 402–406 (1976). In that decision, Chief Judge Fletcher had argued that military commanders should be authorized "to conduct *reasonable* inspections to ferret out drug abuse even absent a showing of probable cause." 1 M.J. at 404. On the other hand, he appears to argue for a new and broader exclusionary rule to the effect that not even evidence of contraband discovered during legitimate inspections should be admissible in criminal proceedings. *See* 1 M.J. at 404. Accordingly, the question addressed by Judge Perry—whether a general search of the type sanctioned by *Schafer, Drew,* and *Owens, supra,* may be reasonable under the Fourth Amendment—was not addressed by Chief Judge Fletcher. The third judge sitting in *Roberts,* Judge Cook, would sustain the search by analogy to the area code-enforcement inspection considered in *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). 2 M.J. at 36–37. As none of the three views commands a majority of the Court, it can-

not be said with authority that the cited decisions upholding a search of all living quarters within a barracks have been overruled.

There is a significant difference between *Roberts* and the case under consideration. In *Roberts* there was insufficient probable cause to order a general search. The authorizing officer knew only that some 21 of 60 men in the fuels branch of the supply squadron were "suspected" of being involved with drugs and that two had been apprehended, about a week before the inspection, for having drugs *at their duty stations.* 25 U.S.C.M.A. at 40, 54 C.M.R. at 40, 2 M.J. at 32; *United States v. Roberts,* 50 C.M.R. 699, 700 (A.F.C.M.R.1975). There was no direct evidence of the presence of marihuana in the barracks. "Probable cause" was obtained through the use of a marihuana detection dog—a matter that likewise has been the subject of divided opinion on the Court of Military Appeals. *See United States v. Thomas,* 24 U.S.C. M.A. 228, 236–238, 51 C.M.R. 607, 615–617, 1 M.J. 397, 405–408 (1976) (Ferguson, S. J., concurring in result). *See also United States v. Roberts, supra* at 34 n. 12.

■ Accordingly, we hold that the search of appellant's barracks, following the discovery of significant quantities of marihuana in the latrines used in common by the occupants, was not unreasonable. *United States v. Drew, supra; United States v. Schafer, supra; United States v. Owens, supra.* The appellant's confession, therefore, was not the product of an unlawful search and seizure.

The findings of guilty and the sentence are affirmed.

Senior Judge JONES concurs.

Judge FELDER, dissenting:

Reduced to its simplest terms, the majority decide that evidence seized as a result of a general exploratory search is admissible because no unifying reason from the United States Court of Military Appeals supports

its exclusion. I do not subscribe to their brand of logic and, respectfully, disagree with their decision.

Two judges agree in *United States v. Roberts,* 25 U.S.C.M.A. 39, 54 C.M.R. 39, 2 M.J. 31 (1976), that fruits of the type search in question here are not admissible in evidence. Although their reasons differ, that should not deter us from reaching the same result in this case.* Conversely, if they had ruled that the fruits of such searches were admissible, although precedent exists to the contrary, we would be duty-bound to follow their decision. Therefore, I would set aside the findings of guilty and return the case for a rehearing.

---

* In *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), the Court in a 5–4 decision held that the imposition and carrying out of the death penalty were unconstitutional. There were three separate opinions written by the majority, each concurring in the result for different reasons. That decision, although fragmented like *Roberts,* foreclosed executions under state statutes then in existence.